**Kurby DECKER**

**v.**

**Chequita DUNBAR, et al.**

**Civil Action No. 5:06cv210.**

United States District Court,
E.D. Texas,
Texarkana Division.

Sept. 29, 2008.

318

Kurby Decker, Tennessee Colony, TX, pro se.

Julia Hamill Murray, Texas Attorney General, Austin, TX, for Chequita Dunbar, Nita Burgess, Latooya Sanders, David L. Hudson, Dennis Martin, Jordan Smith, Jr., Norris Jordan, Kelly Roseberry, Tammy Sharp, V. Barrow, Eugene Allen, Donald Gibson, Pamela Williams, Colt Morton, Herbert Barron, Eric Howell, and Office of the Attorney General of Texas.

*MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND ENTERING FINAL JUDGMENT*

DAVID FOLSOM, District Judge.

The Plaintiff Kurby Decker, proceeding *pro se,* filed this civil rights lawsuit under 42 U.S.C. § 1983 complaining of alleged violations of his constitutional rights. This Court ordered that the case be referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

Decker raised numerous complaints, including allegations of retaliation, denial of access to the law library and legal materials, and cruel and unusual punishment. The Magistrate Judge ordered him to file an amended complaint setting out his claims with more factual specificity, and Decker complied with this order. The Magistrate Judge also ordered the Defendants to answer Decker's lawsuit.

On October 1, 2007, the Defendants filed a motion for summary judgment, along with summary judgment evidence. Decker filed a response to this motion, along with summary judgment evidence of his own; he also requested that his pleadings be considered as summary judgment evidence.

After carefully reviewing all of the pleadings and the summary judgment evidence of the parties, the Magistrate Judge issued a Report on August 22, 2008, recommending that the Defendants' motion for summary judgment be granted and that the lawsuit be dismissed. Decker sought and received an extension of time in which to object, but no objections have been filed; accordingly, he is barred from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appellate review of the unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).

The Court has carefully reviewed the pleadings and documents in this case, as well as the Report of the Magistrate Judge. Upon such review, the Court has concluded that the Report of the Magistrate Judge is correct. It is accordingly

ORDERED that the Report of the Magistrate Judge (docket no. 168) is hereby ADOPTED as the opinion of the District Court. It is further

ORDERED that the Defendants' motion for summary judgment (docket no. 98) is GRANTED and that the above-styled civil

action be and hereby is DISMISSED with prejudice. It is further

ORDERED that any and all other motions which may be pending in this action are hereby DENIED.

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CAROLINE M. CRAVEN, United States Magistrate Judge.

The Plaintiff Kurby Decker, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this civil rights lawsuit under 42 U.S.C. § 1983 complaining of alleged denials of his constitutional rights. Decker sues numerous TDCJ officials, including law librarian Chequita Dunbar, property officer Nita Burgess, classification manager Latoya Sanders, access to courts administrator Vickie Barrow, Warden David Hudson, Captain Dennis Martin, Sgt. Jordan Smith, Lt. Norris Jordan, officer Kelly Roseberry, law library officer Tammy Sharp, officer Eugene Allen, officer Donald Gibson, assistant classification and records director Pamela Allen, officer Colt Morton, Lt. Herbert Barron, and officer Eric Howell. These Defendants have answered the lawsuit and have filed a motion for summary judgment, which is the subject of this Report.

Decker's original complaint was laden with legal conclusions, but short on specific facts. The Court ordered him to file an amended complaint setting forth his claims with more factual specificity, and Decker did file his amended complaint.

In this amended complaint, Decker says first that the defendants Dunbar, Gibson, Sharp, Barrow, Roseberry, Jordan, Roseberry, and Sanders conspired to deprive him of meaningful access to the law library. Between September 14, 2004, and July 16, 2005, Decker says, he was only allowed seven hours per week in the law library, and between November 30, 2005, and June 23, 2006, he was only allowed one hour per week of law library access. He says that "the lack of daily access to the prison law library resulted in inability to file prepare briefs and subsequent dismissals." He says that there is a "mandatory statute" requiring 15 hours per week of law library access and complains that there were pages torn out of a book in the law library, which caused dismissal of one of his lawsuits, apparently by the Texas Supreme Court, on November 17, 2005. Decker also points to a lawsuit which was dismissed by the Second Judicial District Court of Appeals, another one by the 102nd Judicial District Court of Bowie County, and one by the Sixth Judicial District Court of Appeals. Decker says that his lawsuits were "non-frivolous" but does not indicate the basis upon which they were dismissed, nor show that the alleged denial of access to the law library resulted in these dismissals.

Next, Decker says that Dunbar, Burgess, Sharp, Smith, and Jordan conspired to deny him an extra legal storage box. He says that this caused the U.S. Supreme Court to rule against him in his criminal case.

On July 7, 2005, Decker says that Dunbar, Sharp, Gibson, Barrow, Jordan, and Smith denied him restroom privileges for three hours, causing him to urinate on himself. He was then placed in an "outside cage" in "extreme heat" and without water, which caused injury; Decker indicates that he suffered a "ruptured bladder." Following this incident, the defendants Dunbar, Sharp, Barrow, Hudson, Sanders, and Williams retaliated against him by scheduling him for law library ses-

sions with inmates classified in safe-keeping. He says that this caused him to be identified as a homosexual, resulting in his being assaulted on May 12, 2006.

Decker states that Dunbar, Hudson, Martin, Smith, Jordan, Roseberry, Morton, Allen, and Gibson all conspired to deprive him of rights and privileges under the 14th Amendment. He says that they wrote "fourteen bogus disciplinary cases" between January 6, 2004, and September 16, 2006, for "non-posted, non-written disciplinary infractions."

Next, Decker says that Dunbar, Sharp, Burgess, Hudson, Martin, Jordan, and Barrow are violating his rights under the Americans with Disabilities Act by denying him an extra legal storage box due to his disability, and giving him a choice of life or property. He says that he was subjected to retaliation for his writ-writing activities which "shocked the conscience."

Decker further asserts that he was subjected to violations of due process and equal protection which caused him harm in reputation. He again refers to "bogus disciplinary cases" and says that the Defendants are maintaining fraudulent agency records. Decker points to a disciplinary case which he says was written for requesting a grievance form and for asking to use the restroom; he states that this case was given to him for exercising his First Amendment rights.

### Decker's Attachments to his Amended Complaint

Decker includes various attachments to his amended complaint. These include an affidavit, signed by four inmates, saying that on September 14 and September 16, 2006, Morton did an "improper cell search," scattering Decker's legal property into liquid on the floor, leaving his commissary unsecured, and leaving the cell door open. On September 16, 2006, Morton left Decker's cell with a large bag of property, and would not issue Decker confiscation papers. The affidavit goes on to say that Roseberry has a "repugnant reputation" for provoking and harassing inmates for no reason, and that Lt. Jordan makes "fake excuses" and allows malfeasances to continue.

Decker next attaches a Step One grievance, no. 2007006359, dated September 9, 2006, in he says that he and other inmates are being made late in arriving at the law library, causing them to be short some 30 minutes of law library time each day. He says that Roseberry has "widespread animosity" toward writ-writers, and says that Roseberry denied him extra time in the law library because the "pass was written in red ink." He states that on September 7, he, Decker, arrived at the law library at 3:40 p.m. when he was scheduled for 3:45 p.m. Roseberry was verbally abusive and told him that Dunbar "would not tell him nothing" and that he should come back in 20 minutes. He says that Roseberry and Jordan threatened to write him a case if he wrote a complaint against them, and that inmates from other buildings were allowed to sign in at 12:45. The response to this grievance was that Dunbar and Roseberry deny conspiring together, that Roseberry follows the building schedule as outlined, and that inmates are allowed 15 minutes to get from their housing assignment to the law library.

In his Step Two grievance, Decker refers to the actions of Roseberry and Dunbar as a "choreographed scam" and says that the prison officials have a duty to ensure that prisoners arrive at the law library at the scheduled time. He says that Roseberry held the inmates up past the 15 minute grace period, and then Dunbar, Sharp, and Roseberry blamed each other, although it was a "common conspiracy." Decker says that Lt. Jordan told

him that if he filed a complaint, Jordan would write him a case, and then Morton "tore his cell apart" and left the door open. Decker says that when he returned to his cell, $25.00 worth of commissary was missing, although he concedes that he does not know if it was taken by Morton or by other inmates in the area. Decker states that his cellmate's property was not touched, although his cellmate had "a jar of bleach." Decker had a shoe string tied around his radio headphones, and instead of removing the string, Morton wrote him a case, for which he was found guilty. He says that the disciplinary case was "bogus" and was written in retaliation. The response to this grievance was that the Huntsville Access to Courts Office investigated the complaint concerning the law library, and found that on September 7, 2006, Decker signed in at 1:03 p.m. and signed out at 3:00 p.m. He did not request extra time, although he would have qualified for it. The allegations of staff misconduct were adequately addressed in the Step One grievance, and the new allegations, presented for the first time in the Step Two appeal, concerning a cell search and the loss of property would not be addressed.

On September 16, 2006, Decker filed a Step One grievance again complaining that Roseberry caused inmates to arrive late for law library sessions. He says that Jordan continues to harass him and that his cell has been shaken down twice in a week. He complains about the cell search by Morton in which his legal property was scattered, ascribing this search to retaliation. The response to this grievance says that the staff members deny retaliation, that Decker's cell was randomly chosen for search and not picked out, and the property taken from his cell and been altered and would not be returned to him.

In his Step Two appeal, Decker says that Roseberry and Jordan both told him that he would be sorry if he wrote them up. He refers to Morton as a "hit man" who destroyed legal work, took his soap, cleaner, and toilet paper, and fabricated a disciplinary case against Decker because Decker had a shoe string on his headphones, like all of the other inmates do. He says that he has been through six shakedowns and his headphones were never taken, and that Morton could simply have taken the shoe string off. He says that shoe strings are sold in the commissary and cannot endanger security, and contends that his cellmate had a jar of bleach but that Morton told him that "we are after your cellmate not you." Decker says that none of his cellmate's property was scattered about, and again says that this was retaliatory. The response to this grievance was that the property was confiscated per policy and would not be returned. Inmates and their living areas may be searched at any time. No evidence was found to support the allegations of harassment or retaliation for use of the grievance procedures.

### Decker's Amended Supplemental Pleading

In an attached "amended supplemental pleading," Decker says that he was scheduled for the law library from 9:45 to 12:00 p.m., thus forcing him to choose between eating lunch and going to the law library. He says that this caused him to lose pending court actions and prevented him from filing meaningful responses to challenge his conviction and the conditions of his confinement. He cites five cases, including two cases from the 102nd Judicial District Court of Bowie County, two cases from the Second Judicial District Court of Appeals, and one case from the Sixth Judicial District Court of Appeals, saying that these were dismissed for unspecified "procedural errors." He also cites an appeal to the U.S. Supreme Court, in which he

states that the confiscation of documents caused an adverse ruling.

Decker says that Dunbar, Sharp, and Martin are "non-Caucasians" and that they only allowed him one hour per week from November 30, 2005 through June 23, 2006, while allowing members of their race four law library sessions per day. He also complains that they limited his sessions to the "time he could hold his bladder" by denying him restroom privileges.

After again complaining that he had received 14 fabricated disciplinary cases, Decker says that Dunbar, Sanders, and Williams placed a "false gang validation" in his classification file. On January 25, 2005, Decker received notice of a five-year parole set-off; he says that the false validation amounts to "libel and slander" and shows a "reckless disregard for the truth." He also complains about denials of parole, arguing that this violates a constitutionally protected liberty interest. Decker states that he was denied his right to petition for redress of grievances, to be free from unreasonable searches and seizures, to be free from cruel and unusual punishment, and his rights under the Ninth Amendment. He again refers to the incident of July 7, 2005, in which he says that he was forced to urinate on himself and then was taken outside and placed in a cage without water; Decker says that other inmates with heat restrictions are allowed to remain inside 10 Building, which he says is air-conditioned.

Decker says that these occurrences are "a chronology of events from which retaliation may plausibly be inferred," pointing to the "temporal proximity" of his filing grievances with the allegedly retaliatory acts. He says that he filed a grievance on June 23, 2005, and received a disciplinary case on June 25, he filed a grievance on August 2 and received a disciplinary case on August 11, he filed a grievance on

December 29 and received a disciplinary case on January 3, 2006, and he filed a grievance on September 7, 2006, and received a disciplinary case on September 16, 2006. He says that these were some of the 14 bogus disciplinary cases which he received, pointing specifically to case no. 20060001122, in which he says that he was given an order not to ask for a grievance form concerning use of the restroom; Decker concedes that he was found not guilty on this case.

Next, Decker says that Dunbar, Sharp, Barrow, and Hudson are violating the Americans with Disabilities Act. He says that they are denying him an extra legal storage box, and says that until he receives a knee replacement, he cannot qualify for an extra box; however, Decker says, the ADA preempts the state laws and prison regulations. He points to a disciplinary case, no. 20040174418, which he says violates the ADA, and asserts that he cannot leave the unit for "life sustaining cancer treatment" without losing his property or his legal materials.

After he filed a grievance concerning the July 7 incident, Decker says that Dunbar, Sharp, Barrow, Hudson, and Roseberry intentionally scheduled him to go to the law library with inmates in safekeeping, so as to create a false impression that Decker is homosexual. He indicates that this caused him to be physically assaulted on May 12, 2006, some ten months after the incident in question. In addition, after this grievance was filed, Decker says that he was subjected to a "retaliatory cell search" in which some legal work was destroyed and he was deprived of hygienic and cleaning supplies, which resulted in his suffering a bacterial infection.

Decker says that Administrative Directive 03.72, limiting storage space to 1.75 cubic feet, is in conflict with a TDCJ commissary rule, which he says allows eight

cubic feet. He says that it is a violation of the Hobbs Act, 18 U.S.C. § 1951, which prohibits the defendants from "entrapping" inmates by punishing them for acts which are permissible under TDCJ rules. He also asserts that this is a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961.

Decker asserts various claims against Rissi Owens and Jose Aliseda, members of the Texas Board of Pardons and Paroles, which claims have been previously dismissed. He says that he has received disciplinary cases for permissible actions such as going to the chow hall or possessing items which he purchased at the commissary, and that his disciplinary case for requesting to use the restroom violates the Americans with Disabilities Act.

For relief, Decker asks for a declaration that the Defendants are violating his rights under the Constitution, that all of the disciplinary cases are void, that he is not a gang member, and that prison officials cannot punish inmates for exercising constitutional rights, for injunctive relief in that all false entries in his classification file should be removed, all of the disciplinary cases expunged, that the Parole Board be returned to independent status and give individualized attention to all inmates, that parole hearings be held as provided by law and that TDCJ classification records have no role in parole decisions, that all state laws which discriminate against the handicapped be declared void, including TDCJ rules requiring a choice between life and property, that he be issued an extra legal storage locker, and that prison officials be prohibited from using "normal body functions" to deny access to court or from drafting "impossible stipulations" so as to deny access to court. He also asks for declaratory judgments that the defendants violated his constitutional rights in various ways, and for punitive damages in the supplemental complaint, although making no mention of monetary damages in the amended supplemental complaint. In his original complaint, Decker says that he seeks monetary damages for bad faith, fraud, and retaliation.

### Decker's Exhibits and Summary Judgment Evidence

Decker attached a number of exhibits to his original complaint. The first of these is a letter from the TDCJ Office of the Ombudsman to a person named Jackie Ullrich. This letter refers to a search of Decker's property occurring prior to June 26, 2003; while the letter is not entirely clear, it appears to say that no legal property was confiscated during that search, but only envelopes and folders. A grievance response dated September 17, 2003, referring to this search, says that no legal material was taken and that Decker was given the opportunity to separate the property he wanted which would fit into the storage space. Next is a property confiscation form, referring to a search on March 3, 2004, which says that the property confiscated includes 22 soups, six beef stews, a tortilla cup, three packs of mints, a lock, three packs of peanuts, three chilis, 10 peanut butters, 10 coffees, two packs of hot sauce, three Cokes, a bag and a half of chips, one "spread," one pastry, soap, half a bag of beans, 27 "cool offs," a watch, a pack of cheese, and two items described as "candy." The reasons given for the confiscation were "excessive amounts" and "improperly stored."

The next exhibit is a set of pages from Decker's medical records. The first page, dated March 19, 2004, says that Decker was seen on March 11 at an orthopedics clinic for right knee pain. No surgery on his knee was to be done until physical therapy was completed, but Decker was refusing physical therapy. The nurse gave him a knee brace for six weeks. The next

page, dated January 29, 2002, also refers to Decker's knee problems.

An entry in the medical records dated July 11, 2005, says that Decker was seen in the clinic with a complaint that he was in the law library and was not allowed to use the restroom, and wet himself after three hours. Since that time, he said, he was having difficulty starting a urine stream. Large amounts of blood were found in his urine, and the nurse stated that she would refer him to a provider for evaluation.

The next entry submitted by Decker is dated November 15, 2005. At this time, Decker wanted a referral to the telemed (video) clinic for urology, but the nurse noted that an IVP (intravenous pyelogram, an X-ray examination of the kidneys, ureter, and bladder) was to be done before such a referral would be done. Decker would not accept a video appointment for a right thigh melanoma. Decker told the nurse that "his legal problems are to be solved first before traveling to HG [the hospital in Galveston] for referrals and X-rays." He asked for a renewal of Naproxen for bladder pain, but this was denied because he was on another medication called Zantac. An examination of his right thigh and groin showed no evidence that the melanoma had recurred or of regional metastasis, and a follow-up was ordered on his complaint of hematuria (blood in the urine).

The next medical records page submitted by Decker is dated May 15, 2006. Decker told medical personnel that he had been "jumped last Friday." On May 26, he had a follow-up appointment complaining of back pain.

The final medical records page is dated July 7, 2005. Decker walked into the clinic complaining of dehydration, saying that he had to sit in the cage for a couple of hours [the number "3" is handwritten in above the word "couple"] before he got moved into a housing area, and now he is light-headed. The nurse noted no problems with Decker's ambulation and that his respiration was even and unlabored, and he was instructed to lay down when he felt light-headed, and that he should submit a sick call for non-emergency medical needs.

Next, Decker submits a disciplinary case, but the nature of the charge is not legible on the copy. The case was a minor one, and the only punishment which Decker received was a reprimand. Decker then submits a letter from the Board of Pardons and Paroles, telling him that his parole was denied because the record indicates that he has repeatedly committed criminal episodes or has a pattern of criminal offenses, indicating that he has a predisposition to commit criminal acts upon release; or the record indicates that he is a leader or active participant in gang or organized criminal activity; the record indicates that he committed one or more violent criminal acts indicating a conscious disregard for the lives, safety, or property of others; the instant offense or pattern of criminal activity has elements of brutality, violence, or conscious selection of a victim's vulnerability such that the offender poses a continuing threat to public safety; and the record indicates use of a weapon.

Decker then attaches an affidavit, dated April 8, 2006, listing the hours he was able to attend the law library. Between December 6, 2005, and April 8, 2006, Decker says that he was able to go for a total of 20 hours, an average of one hour per week. He states that Dunbar changed his regular 12:45 session because it was "too convenient" and he was getting 13 to 15 hours per week. After the change, he says, he has to choose between going to the law library and going to meals, the necessities department, or the pill window. In addition, he says, there is a policy that inmates

cannot use the restroom during count, and Dunbar only allows non-Caucasian inmates to sign in late.

### Grievances Filed by Decker

Decker submits grievance no. 2006083154, dated January 14, 2006, saying that he received three disciplinary cases for asking to use the restroom and then was placed in an outside cage (referring to the July 5, 2005 incident), that Dunbar has now intentionally scheduled him for the 4:00 p.m. law library session knowing that he cannot urinate until he gets his medication and he cannot attend the law library with a full bladder, and as a result, he has had only six hours of law library time in the past seven weeks. He complains of other inmates receiving preferential treatment and being allowed to attend four law library sessions a day. The response was that Decker had raised numerous issues in the grievance and only one would be addressed. Dunbar denied writing any false cases against Decker in retaliation for use of the grievance process, and asserted that all cases written by her were true and correct. Decker furnished no evidence or witnesses to support his claims, the response said, and so no further action was warranted.

Decker filed a Step Two appeal saying that the First Amendment was absolute and that Dunbar and Sharp were "legislating their own rules." He says that he was charged with possession of zip-lock bags, which are issued with medications through the medical department, and so Dunbar's disciplinary case constituted perjury. He also said that his legal property was not stored in an unauthorized manner, but that he was found guilty of both of these disciplinary cases because of a "social agenda" between Dunbar and Lt. Traylor, apparently the hearing officer. He says that he received disciplinary cases for talking, which violates his rights under the First Amendment, and that his legal work was confiscated although Dunbar falsified a response saying that it had not been taken. Decker complains that Dunbar sets the clock six minutes fast and so apparently allows Decker only nine minutes for a grace period and that she is supposed to call the building and make sure it is not his fault if he is late. He says that this is the second week of a lockdown and indicates that he is being denied access to law books, although he has "eight active cases." The response was that Dunbar denied writing false disciplinary cases in retaliation for grievances and that Decker had the right to appeal any disciplinary cases which he received. The response says that Decker raised numerous issues in his grievance and should limit himself to one issue per grievance.

On January 23, 2006, Decker filed grievance no. 2006086575, complaining about a disciplinary case which he received, which he says was the result of conspiracy and retaliation. The response was that the case was reviewed and no procedural errors were noted, and that the claims of conspiracy and retaliation by Dunbar and Captain Martin could not be substantiated. In his Step Two grievance appeal, Decker says that there was a procedural error in that Sgt. Brantly falsified the investigation form by failing to investigate; no one talked to Lt. Taulbert or Capt. Kroll to verify that Decker had permission to be in the necessities line; Decker was the only inmate who received a disciplinary case; and that case and the other cases which he received showed a pattern of retaliation. The response was that the case had been reviewed and found to be without merit, there was insufficient evidence to show that Decker had received the case as a result of retaliation, and there were no apparent due process errors.

Next, Decker submits grievance no. 2006077181, which he filed on January 9, 2006, complaining of being allowed insufficient law library time in retaliation for grievances previously filed. He complains of being forced to choose between being allowed to urinate and getting access to the law library and asks that he be allowed 15 hours per week in the law library. The response was that Decker received lay-ins for law library sessions on January 3, 4, 5, and 7, and that he made no request for January 6; he attended sessions on January 3, 5, and 7, and none of these sessions were terminated. In his Step Two appeal, Decker says that he should be given a choice between law library sessions and certain activities, but that he has been scheduled during morning and afternoon pill window sessions, chow, and necessities. When his session concludes at 6:00 p.m., the pill window and the chow hall are closed, and so he has to argue with officials to get a peanut butter sandwich, while all other inmates receive a hot, nutritious meal. He complains of going to the law library with inmates in safekeeping and says that only non-Caucasian inmates are allowed to sign in late; these inmates also get four sessions a day, but he only gets one. The response was that the Step One grievance response had addressed his complaint and that the issue had been previously addressed in three other grievances.

On December 26, 2005, Decker filed a grievance complaining that Dunbar is retaliating against him for filing grievances. He again refers to the July 7, 2005 incident, and largely repeats complaints made in other grievances about other inmates being allowed to sign in late, being placed in an outside cage, and having to choose between law library sessions and meals. The response to this grievance was that Decker had received lay-ins, at his request, for December 20, 21, 22, and 23, and attended sessions on December 20, 21, and 23, and that Dunbar stated that he is not being retaliated against. In his Step Two appeal, Decker says that the U.S. Constitution is the supreme law of the land, preempting all of Dunbar's stipulations, that Dunbar has falsified state documents, and that he had bogus disciplinary cases fabricated against him. The response was that the Step One grievance response had addressed his complaint, law library time was scheduled in accordance with policy, and no further action is warranted.

On June 30, 2005, Decker filed a Step One grievance complaining about a disciplinary case in which he was charged with possession of contraband, in the form of a rubber grip. Decker says that these are allowed at the Hughes Unit and that the item had not been altered. He states that when he arrived at the unit, officers Gibson and Long began harassing him. All of the other inmates had a retractable pen, steel casings, a rubber grip, legal folders with tape on them, which were altered from their original state, and one inmate had a "stolen typewriter," but Gibson did not confiscate it; instead, Decker was written a case for having a rubber grip, and no confiscation papers were provided. He asked Gibson why he didn't write cases on the inmates having the altered legal folders with stolen State tape, and Gibson replied that the other inmates did not write grievances. He says that Gibson verbally abuses him and that an officer named Long tells him to shut up while all of the other inmates are talking and he had not said a word. Long would send him back, apparently from the law library, if he is one minute late, while other inmates are allowed to be late, and he is denied extra time. The response to this grievance was that the disciplinary case had been reviewed and no procedural errors were noted, sufficient evidence existed to support the finding of guilt, and the

punishment imposed was within established guidelines.

In his Step Two appeal, Decker says that Gibson has a vendetta against him, he was singled out for "disparate treatment," and the case was written to stop him from filing grievances. The response was that all unit commissaries sell the same basic items, and that a pen with a rubber grip is not sold in the commissary. No evidence was found to support the allegations of retaliation. Decker was found to be in possession of contraband and so a disciplinary case was written in accordance with policy.

On August 19, 2005, Decker filed a grievance complaining that he has only been getting seven hours per week in the law library, and then issued a written stipulation that if an inmate uses the restroom, he forfeits extra time. He says that the Access to Courts Department "corrected" Dunbar in grievance no. 2005148136 and 2005152311, and so on July 19, 2005, Dunbar began giving him extra time. However, on August 10 and August 12, 2005, Decker says that he gave requests to Officer Long, who became verbally abusive and told him to "shut up." He asked her to check the pass written by her supervisor, and she became belligerent, and then had Officer Gibson "incite more harassment." He says that Long is Gibson's wife, which creates a conflict of interest, and that Gibson falsely accused him of creating a disturbance. He repeats various complaints about inadequate storage space, how he cannot leave the unit for emergency medical care, he cannot get books while on lockdown, he cannot get a trust fund print-out, he cannot get legal visits, the books have pages missing, he is subjected to constant retaliation, and he has been abused for requesting what the rules allow. The response to the grievance was that Decker had presented numerous issues, of which only one would be addressed. Dunbar stated that inmates needing to use the restroom while attending the law library had to sign out and return to their housing assignments, and that August 10, 11, and 12, Decker received two hours of access to the law library each day.

In his Step Two grievance appeal, Decker says that if an inmate has medical problems, he still must forfeit law library time if he needs to use the restroom. He says that only ordinary circumstances, there is no justification to deny general population inmate extra time in the law library, which is a "mandatory statute" apparently conferring a liberty interest. Decker again says that non-Caucasian inmates are allowed to sign in late and that Dunbar is falsifying records, as shown by the "nine bogus disciplinary cases" which she has written him. The response to this grievance appeal was that law library attendance is voluntary, he can terminate the session at his convenience, inmates cannot return to the law library without first obtaining permission, and that if he needs an accommodation, he must present the law library staff with justification.

On July 22, 2005, Decker filed a grievance complaining that he was only allowed fourteen hours of law library access for a two-week period, but he is supposed to get 10 hours per week or more. He says that on July 5, Dr. Stanley received information from UTMB about Decker's melanoma, and called Decker to the clinic. Decker had a law library session from 12:15 to 2:30 p.m., but he stayed in the clinic until 1:13. After he got to the law library, he was ordered to leave at 2:20 by an officer identified as "Ms. Shari;" he asked if he could have two hours, but she became abusive and told him to get out. Decker states that other inmates were allowed to stay until 3:30, but does not say when

these inmates arrived. On July 8 and 9, he says, Officer Long sent an officer named Neddleton to confiscate Decker's lay-in passes on the ground that Long had cancelled his sessions. He says that another officer, Martin, confirmed that Decker had given I–60 requests each day to Long, but Long stated that if Decker used the restroom, he could not get extra time. On July 13, Decker says that he did not get a lay-in and was told that Long had cancelled the session, and he was unable to sign up for the next session.

Decker states that Dunbar had a "new scam," in that she would call for the law library session at five minutes before 6:00 a.m., and when Decker got to the front desk, it would be count time. Dunbar would then refuse him a lay-in pass and tell the warden that Decker had failed to show up for extra time. The response to this grievance was that numerous issues were raised in the grievance, but only one would be addressed. Decker was laid in to attend a law library session on July 9, 2005, but did not attend, and that law library sessions are scheduled in accordance with policy.

On May 16, 2006, Decker filed a grievance complaining that he was being subjected to a "gradual repudiation" of his right of access to court in retaliation for his filing of grievances. He talks about the incident in July of 2005 and complains about being sent back from the law library when he is late. On May 12, 2006, he says, he placed prison officials on notice that he was being "sexually harassed," and says that he was assaulted by 4 Building gang members. He says that Sanders conspired with Dunbar in some way with regard to this assault. Decker also complains that he cannot leave the unit for cancer treatment and that a "hit" had been placed on him. He acknowledges that Dunbar now allows a restroom break after

two hours, but says that black inmates can come to the law library at 12:45 and stay until 6:00 p.m. The response to this grievance was that Decker had requested and received law library lay-ins on May 23, 24, 25, 26, and 27, but only attended the May 27 session.

In his Step Two appeal, Decker says that Dunbar scheduled him with inmates in safekeeping for the sole reason of having him assaulted and defamed, and now he has to file a life endangerment complaint. He says that he has missed over eight court deadlines and says that Dunbar is showing favoritism to members of her own race. He contends that Dunbar is forcing him to choose between daily law library sessions and physical assault. The response to this grievance was that the Step One response had addressed his complaint, and that Decker had been scheduled for law library sessions on May 23, 24, 25, 26, and 27, but chose to attend only on May 26; law library attendance is scheduled according to policy and no further action is warranted.

In a Step One grievance filed in May of 2004, Decker says that Dr. Stanley had ordered that he receive an extra storage box because he is waiting for knee replacement surgery; he explains that in order to access his bunk locker, he has to kneel on his injured knee. However, he says, he received a disciplinary case for requesting an extra storage locker. Sgt. Smith told him that it was not a safety issue and directed profanity at him. The response to the grievance was that inmates could get extra storage space for medical reasons, and that Decker had received a pass for an extra storage container, which was canceled on May 27, 2004.

In his Step Two appeal, Decker says, obliquely, that his legal work was confiscated and he was subjected to harassment and retaliation. He says that he was told

that "contraband baggies" were found in his storage box, but that medical staff has verified that they issued the baggies. He complains that this was done in retaliation for his filing complaints. The response was that the Step One grievance addressed his complaint and that this issue had been addressed in a prior grievance.

On February 17, 2004, Decker filed a grievance saying that on January 23, Officer Clements [Dunbar] was overheard telling Lt. Martin to "lean on" Decker because he is a trouble maker. He says that Dunbar falsified a response saying that no legal work had been confiscated in March of 2003. Martin began denying Decker access to the chow hall, while allowing other inmates to eat. On the date of the grievance, Decker says, Dunbar ordered him out of his cell while she searched and read his legal work. He says that rules require that he be present while his legal materials are searched, and that she took away his locker in retaliation. The response was that on February 17, 2004, a 90–day review was done to verify the continued need for an extra storage box. No legal material was read, but during the search, four ziplock bags were removed from empty writ envelopes. The storage of unauthorized items resulted in the confiscation of the legal storage container. In addition, there was no request from Decker to use the law library on February 18. He did have a lay-in on February 17, but did not show up.

In a Step One grievance filed on March 29, 2004, Decker complains of the taking of his storage box, linking this to false disciplinary cases which he had received from Dunbar. He says that the locker box was taken in retaliation for his grievances, and says that he is handicapped and waiting on knee replacement surgery. Decker says that because he was removed from the cell, he does not know if Dunbar took the bag-

gies out of another locker and placed them in his legal box. The response was that subsequent storage (i.e. the extra locker box) is issued in accordance with access to court policies, but shall not be maintained to conceal contraband.

In a Step One grievance filed July 10, 2005, Decker states that he was scheduled for a law library session from 12:15 to 2:30 p.m. At 2:20, he asked to use the restroom, which according to Dunbar's rule, means that the inmate must sign out and terminate his session. Count was called at that time, and Long told him that he would have to wait until count was verified. Sharp, Gibson, and an officer named Washington were talking. Long said that she did not care if "you urinate your pants and die." At 2:50, after urinating in his pants (Decker describes this as "almost three hours wait"), Gibson finally took him to the restroom. He says that he did not bring this to Gibson's attention until he left the law library, to reduce his humiliation.

Afterwards, Decker says, Gibson took him and another inmate, Gilbert, to the 12 Building chain pen, a holding area. He was placed in the pen closest to the wall, with no air circulation from 2:50 until 4:15 p.m. During this time, Decker says, he sat in soiled urine, with no water, no restroom breaks, and no way to cool off, although the temperature was 95 degrees. He says that both he and Gilbert have heat restrictions due to medications which they are taking, but that they were left in the heat with no water for about an hour and a half. Decker contends that by law, inmates locked in cages must have access to water and restroom breaks once an hour. The response to this grievance was that Decker's complaint of harassment, being denied a proper restroom break, and being placed in a holding cage for over an hour in the heat, could not be substantiated.

In a Step Two grievance appeal, Decker says that as a result of the incident, he is now being treated for a bladder rupture with a medication called oxybutynin, an anti-cholinergic (i.e. it relaxes the bladder muscles). He says that Dunbar continues to deny him access to the restroom, and on August 30, 2005, she ordered him not to ask for another restroom break, and then wrote him a disciplinary case when he did so. Decker also repeats previous complaints about taking away his locker box, not providing him with sufficient law library time, discriminating in favor of non-Caucasian inmates, and retaliation. The response to this grievance was that Decker was attempting to leave the law library during count, and as soon as count was completed for the law library, he was taken to the restroom. He was placed in the holding area for about 10 minutes until the building count was completed, and there was no evidence that staff acted inappropriately. On the grievance response form, Decker circled the "10 minutes" and wrote "fraud, it was 90 min, documented in log."

### The Defendants' Motion for Summary Judgment

The Defendants have filed a motion for summary judgment, accompanied by numerous exhibits as summary judgment evidence. This motion begins by arguing that Decker fails to meet the redressability element of standing with regard to his request for prospective injunctive relief, that the Defendants are entitled to qualified immunity, and that the claims against Sanders, Hudson, Martin, Barrow, and Williams fail because of a lack of showing of personal involvement by these officials, who all have supervisory roles.

Turning to the issue of access to courts, the Defendants note that Decker alleges that he has been denied access to the law library, resulting in a denial of access to court. However, they state, as the grievance responses show, Decker often does not attend sessions for which a pass is issued. They state that between June 1, 2006 and August 15, 2007, a period of 440 days,[1] Decker attended 382 law library sessions. They note that if he needed additional time, he could have simply asked for it, and such time is normally granted as a matter of course.

Furthermore, the Defendants state, even if Decker was denied access to the law library, he has not shown that he suffered any harm. While Decker lists several different lawsuits which were allegedly prejudiced, the Defendants state that John Patrick, a program specialist for the Access to Courts Division, investigated Decker's claims and found no evidence that Decker missed any court deadlines, and Decker offers no competent summary judgment evidence showing that any such deadlines were missed.

Although Decker complains that he was denied law library books while the unit was on lockdown, the Defendants state that according to law library records, law books were delivered to Decker 20 separate times while the unit was on lockdown.

Decker also complains about the confiscation of his legal storage box, which the Defendants acknowledge was done on February 17, 2004. However, this box was confiscated because a cell search found contraband stored in it. They state that extra storage is a privilege, which can be revoked. The Defendants further state that Decker had the opportunity to reapply for the storage box, but did not do so, and that a check of pending court cases did not show that Decker had suffered harm in any such case as a result of the confiscation.

---

[1]. The motion for summary judgment incorrectly calculates this period as 483 days.

Decker states that he is forced to choose between eating and going to the law library. He says that he was scheduled for the law library between 9:45 and 12:00 p.m.; the Defendants state that lunch is served from 9:30 to 12:30 p.m., giving Decker ample time to eat even if he stays for the full session. They note that the Supreme Court has stated that inmates are not guaranteed the wherewithal to "transform themselves into litigating engines," and that Decker has had ample opportunity to avail himself of the law library; the fact that he simply believes himself entitled to yet more time is not sufficient to sustain a cause of action.

Turning to the issue of retaliation, the Defendants aver that Decker has offered no evidence that he would not have received disciplinary cases but for the purported retaliatory motive. They note that Decker was afforded a hearing on each of these cases, evidence was offered, and the cases were upheld on appeal, and state that Decker simply makes conclusory allegations that he was retaliated against, which allegations are not sufficient to support Section 1983 liability.

As to the cases themselves, the Defendants contend that any claims for damages based on the disciplinary cases themselves are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), in which the Supreme Court held that claims for relief based on due process violations in prison disciplinary proceedings which necessarily imply the invalidity of the punishment imposed are not cognizable under Section 1983, but must be vindicated through habeas corpus.

Decker also claims retaliation through the scheduling of law library sessions. The Defendants argue that Decker has failed to show that but for the alleged retaliatory motive, the incidents complained of would not have occurred. They state that law library sessions were scheduled based on availability, inasmuch as all inmates requesting law library time must be taken into account when scheduling is done. Factors such as work schedules, medical visits, and educational opportunities also had to be taken into account. The Defendants say that when all of these factors were considered, the best time for Decker was 9:45 to 12:00; thus, they state, Decker has failed to show that but for the alleged retaliatory motive, this would not have been done.

The next issue to which the Defendants turn is that of deliberate indifference to Decker's medical needs. Decker asserts that he suffered a ruptured bladder as a result of denial of a restroom for three hours on July 7, 2005; however, the Defendants state that Decker's medical records show no evidence that her has suffered a ruptured bladder at all. While he does have urological problems, the Defendants assert that none of these would be caused or exacerbated by denial of restroom privileges for a few hours. They state that according to Decker's medical records, he has no medical conditions which would require a rigid restroom schedule, and reiterate that his condition was not exacerbated by a short denial of restroom facilities.

Similarly, Decker complains that he was placed in a hot holding cell for an extended period of time. While the Defendants acknowledge that Decker has a work restriction preventing him from being assigned to work in areas with temperature extremes, they contend that this refers to assigning him to a work detail, not his daily life at the unit. The Defendants further state that after spending time in the holding cell, he went to the medical department, where he complained of dehydration but medical personnel found no outward signs

of any medical issues. Decker had no problem with ambulation, his blood pressure was normal, and his breathing was unlabored. Dr. Reginald Stanley says in an affidavit that sitting in a hot cell for a short period of time would not adversely affect Decker's medical condition, and holding cells are a normal part of life at the prison and inmates can expect to be placed in such a cell for a few hours from time to time.

Decker complains that the Defendants have put him to a choice between his medical treatment and his legal property. However, the Defendants state that if Decker chooses to leave the unit to receive medical care, his property will be stored until his return or sent to his new unit of assignment, as per TDCJ regulations, although any contraband or excessive property would be confiscated.

The Defendants point out that they are not medical providers and have no control over the treatment which Decker receives. They state that he has been offered the opportunity to receive treatment at the hospital in Galveston, but he has consistently refused. They say that medical personnel have stated that they cannot understand Decker's paranoia over his legal materials, but speculate that because he has been diagnosed with a major depressive disorder with psychotic features, this condition may contribute to his paranoia over his legal property. The Defendants reiterate that if Decker chooses to avail himself of medical treatment off of the unit, his property will be stored according to TDCJ regulations, and so Decker has not shown that they were deliberately indifferent to his medical needs.

Decker also complains that the Defendants were deliberately indifferent to his safety with regard to an alleged assault on May 12, 2006. He says that this assault came about because other inmates believed that he was homosexual because he was scheduled for law library time with inmates in safekeeping. They state that prison records contain no mention of an assault, although Decker did report to the medical facility on May 15 with a bruise under his left eye. The Defendants further assert that Decker did not place them on notice of the assault; while he did file grievances saying that he was in danger because other inmates believed that he was homosexual, he offered no specific facts, but only vague assertions, which gave the prison officials nothing to work with.

Decker contends that he has been erroneously labeled as a gang member, which has damaged his chances for parole. The Defendants state that Decker has never been classified as a gang member, and speculate that he may have inferred that he has from the letter notifying him of denial of parole. This letter, as noted above, gives one basis for the denial of parole that "the record indicates that the offender repeatedly committed criminal episodes or has a pattern of similar offenses that indicate a pattern to commit criminal acts upon release; or the record indicates that the offender is a leader or active participant in a gang . . .". One or more of the factors mentioned in the letter could be a reason why Decker was denied parole; the Defendants say that because Decker has never been classified as a gang member, this subsection obviously did not apply to him.

Decker also cites the Americans with Disabilities Act, which provides in pertinent part that ". . . no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Accord-

ing to the Defendants, Decker's allegations concerning receipt of disciplinary cases and denial of an extra legal storage do not show violations of the ADA because he has not shown the denial of access to a program because of his disability. Decker's legal storage box was confiscated in February of 2004 because he had contraband stored in it. He was advised how to reapply to get another one, but never placed such a request. The Defendants state that Decker's storage box was confiscated because he was violating TDCJ rules, not because of his disability.

The Defendants assert that Decker's conspiracy claims must fail because all of the Defendants are members of the same collective entity and so the alleged conspiracy does not involve "two or more people." In addition, they state that Decker's conspiracy claims are wholly conclusory and lack any specific facts, and that Decker has not shown the actual deprivation of any constitutional rights, which showing is required to sustain a conspiracy claim.

### The Defendants' Summary Judgment Evidence Decker's Medical Records

As noted above, Decker's medical records show that on July 7, 2005, he walked into the clinic complaining of dehydration, saying that he had to sit in a cage for a couple of hours and now he is light-headed. No problem was seen with ambulation, his vital signs were checked, his respiration was even and unlabored, and he was educated on lying down when he felt light-headed and told to submit a sick call request for all non-emergency problems.

On August 2, 2005, Decker came into the clinic saying that he feels depressed and he has a nocturnal cough. Dr. Stanley noted that Decker signed a refusal of treatment form for surgery at Galveston, although the doctor told him that this surgery was needed for the melanoma on his leg. After the melanoma was diagnosed. In June of 2005, the medical records contain the following entry by Dr. Stanley: "Extensive discussion of the case with the patient. He needs to go to HG [Hospital Galveston] for further surgery possibly including skin graft, groin dissection, etc. To my surprise patient refuses to go until his legal problems are solved-this could take from weeks to months. Patient not willing to change his mind anytime now. ROT [refusal of treatment] signed by the patient. RTC [return to clinic] RS [reschedule] in two weeks. Uncooperative and unreasonable offender."

Dr. Stanley's affidavit says that a ruptured bladder is an extremely serious condition, representing a urological emergency, and without surgical intervention, the patient is likely to die. Decker never received any such surgery. While Decker does have urological conditions such as benign enlargement of the prostate, hematuria (blood in the urine) and frequency of urination, none of these conditions would be caused by denial of the restroom for a few hours.

### Decker's Disciplinary Cases

The Defendants' summary judgment evidence includes a number of disciplinary cases which Decker received and upon which he was found guilty. In case no. 20070016941, a minor case dated September 16, 2006, Decker was charged with possession of altered headphones, in that a place was created wherein contraband could be concealed. Decker stated that "I had a shoe string tied on them." He was found guilty of the charge and given 15 days of cell restrictions.

In case no. 2006122714, a minor case dated January 3, 2006, Decker was charged with being out of place, in that he had been called out for the pill window line but was in the necessities line. His state-

ment indicated that he was in the necessities line. He was found guilty of the charge and given 30 days of recreation restriction.

In case no. 20050343862, a minor case dated August 11, 2005, Decker was charged with creating a disturbance, in that he yelled and refused to stop while in the law library. Gibson said that he told Decker that his extra time would soon be up and that he would have to wrap up his legal work for the day, and Decker yelled "you better check my pass." Gibson told Decker to stop yelling but Decker continued to do so, and so Gibson ordered Decker to stop yelling, put up his books, and exit the law library. Decker did put up his books but kept yelling until he left. Decker was found guilty of the charge and given 30 days of recreation restriction and 15 hours of extra duty.

In case no. 20050295508, a minor case dated June 25, 2005, Decker was charged with possession of contraband, in that he had a pen with a writing grip made of rubber placed on it, which is an item not allowed or assigned to inmates and not bought for his use in the commissary. Decker's statement said that he got the rubber grip, which was allowed on another unit, on a pen there, but acknowledged that he had taken it off of the pen it came with and put it on another pen. An officer quoted Decker as saying that the grip was for "craft shop items." He was found guilty of the charge and given a verbal reprimand.

In case no. 20050055433, a minor case dated April 20, 2004, Decker was charged with failing to obey an order, which was Dunbar's order for him to stop talking. Decker's statement says that he was trying to resolve an issue that the supervisor was imposing over the use of toilet facilities during law library sessions. Decker was found guilty of the charge and was given 15 days of recreation restriction and 15 days of cell restriction. Decker was quoted as saying that he had permission from Officer Sharp to talk, but Sharp gave a statement saying that she had not given him permission to do so.

In case no. 20040282502, a minor case dated June 6, 2004, Decker was charged with being out of place, in that he was in the no. 4 chow hall at the Three Row table when he had no authorization to be there. The statement of the charging officer, E. Allen, said that Decker had been sitting at the Two Row table, got up, and moved to the Three Row table without permission. As punishment, Decker received a verbal reprimand, 15 days of cell restriction, and 15 days of commissary restriction.

In case no. 20040174418, a minor case dated February 17, 2004, Decker was charged with possession of contraband in the form of four ziplock bags, and having legal property stored in an unauthorized manner. Decker's statement said that the bags were issued by the medical department. He was found guilty of the charge and given 30 days of commissary restriction and 20 hours of extra duty.

In case no. 20040132851, a minor case dated January 6, 2004, Decker was charged with being out of place, in that he was in line for the commissary when he had no authorization to be there, since he was supposed to be going to the education department. He stated that he had a medical lay-in and that an officer gave him permission to be in the commissary line. Decker was found guilty of the charge and given 15 days of cell and recreation restriction and 30 days of commissary restriction.

*Decker's Response to the Motion for Summary Judgment*

In his response, Decker asks that the Court incorporate docket no.'s 1, 2, 9, 24, 63, 80, 81, and 86 into his opposition to the

motion for summary judgment. He complains, untruthfully, that the fact that the Court has not ordered the discovery which he wants shows "a relationship with the Attorney General's office" that influences the integrity of the court proceedings.

Decker then submits an affidavit, saying that the assertions therein are "uncontested and must be accepted as true." He says that "thirty-four contrived disciplinary cases" were not written for violations of TDCJ rules, that an overbreadth analysis shows them to be overly vague and ambiguous, and in violation of his right to free speech. He says that these each of these thirty-four cases were written within days of his undertaking protected conduct, which was the filing of grievances.

Decker again says that preferential treatment was accorded to non-Caucasian inmates; he first says that this was based on race, and then that it was done to inhibit and punish him for his exercise of constitutional rights. He says that there was a pattern of racketeering activity in violation of the Americans with Disabilities Act and insists that his locker box was taken because of his disability and that he was denied access to the law library because he could not walk fast enough to get there. He accuses the Defendants of enacting "arbitrary non-existent rules," such as a rule saying that law library sessions are terminated if the inmate is over 15 minutes late, or rules relating to the termination of law library sessions if an inmate must use the restroom.

Decker states that the Defendants have "admitted all fraud allegations of scienter," and that the grievance and disciplinary records attached to the motion for summary judgment are "incomplete and not true." He complains that they disclosed confidential mental health records in the motion for summary judgment, and says that the defendants have admitted that

they violated the Americans with Disabilities Act by confiscating his legal locker box in order to "stage commissary confiscations without due process of law." He reiterates his claims that the confiscation of his legal materials caused injury in pending litigation.

Decker also says that the Defendants have "admitted" that they constructively denied him access to the law library, that they discriminated against him due to his bladder injury, that they violated the Privacy Act, that all other inmates except for him receive hourly restroom breaks. He says that the characterization of him as a gang member is "intentional malice, libel and slander."

Continuing his theme, Decker says that the Defendants have "admitted" that officers conspired to write him disciplinary cases just days after he filed grievances, that they breached the "contract clause" of 42 U.S.C. § 1981 by their implied breach of TDCJ access to court rules. He says that he has an equal protection claim in the fact that non-Caucasian inmates were allowed more time in the law library than he was. He denies attending 382 law library sessions in 440 days, saying that the actual number was 112. He says that he was only allowed seven hours per week of law library access and that pages were torn out of a law book, and that he had a civil case dismissed in Bowie County for failure to list the date that a grievance was filed.

Decker says that Dunbar and Sharp falsely try to shift the blame to him by saying that he did not attend scheduled law library sessions; he says that he was scheduled to go to the law library at count time, which delayed him. On March 15, 2006, Decker says, he got out of his cell at 10:22 and arrived at the law library at 10:33, so he was denied his law library session. On March 16, count cleared at

10:35, and Dunbar denied his session. On March 17, count cleared at 10:15, and Ms, Kennedy called the law library; an officer there said "come on over" but when he got there, Sharp would not let him in. Decker says that Sharp "always allows blacks to stay," or "pretends to call the building" to verify that count just cleared.

Decker says that although the Defendants' summary judgment evidence says that lunch is served through 12:30, in fact they are finished with it by 12:00. He says that inmates who attend the 9:45 law library session "are denied a hot nutritious meal" and must argue with prison officials to get "a cold peanut butter sandwich." He says that on most days, Dunbar and Sharp order inmates to leave the law library sessions early but not sign out in order to conceal "scheduling breaches." He says that this deprives him of food in some unspecified way.

Decker asks that all unsworn affidavits attached to the Defendants' motion for summary judgment be stricken and disregarded, and that the motion itself is "misleading, indeterminable, and fraudulent." He again says that his legal box was wrongly confiscated because the baggies had been issued by medical staff, and that this led to the taking of other legal property. He says that he received a disciplinary case for not being able to reach his storage box, and that he was unable to file affidavits in his Supreme Court case and a case in the Fifth Circuit. Decker also says that he did not request another storage box because he would just have received another disciplinary case for his disability.

Decker states that "retaliatory cell searches" confiscating inmates' legal papers and commissary items is sufficient harm upon which to base a retaliation claim. He says that the prison administrators failed to investigate his retaliation complaints, or to reprimand or discipline the officers involved, and this shows that the retaliatory acts were condoned by the supervisors. Decker argues that this means that retaliation was a "custom or policy," making injunctive relief mandatory. Next, Decker says that there are "federal law violations" in that the commissary allows purchases of up to $75.00, but there is not sufficient storage space; thus, the inmate makes a purchase and takes it back to his cell, only to discover that the items purchased will not fit into the storage box, making them contraband and subjecting them to confiscation, after the items have already been paid for. Thus, Decker says, purchases made under TDCJ commissary rules become contraband under security rules, and so the property is "taken away and given to other inmates." Decker says that this violates the Takings Clause and "entraps" inmates, thus violating RICO. He concedes that prison officials may impose reasonable restrictions on the amount of property an inmate may possess, but says that they have a "protected interest" in possession of property which cannot be infringed without due process. Because he is allowed to purchase the property at the commissary, Decker says, he cannot be punished for exercising this right. He again says that the Hobbs Act preempts state law, as does the Federal Trade Commission Act and consumer protection laws.

Although Warden Hudson's affidavit, in the Defendants' summary judgment evidence, says that if Decker leaves the unit for medical care, his property will be stored as per TDCJ regulations, Decker says that without an extra storage box, he will be unable to store more than 1.75 cubic feet. He says that he cannot qualify for an extra storage box until after he receives a knee replacement, and that he is unable to freely exercise his choice to obtain medical care. Decker claims that Warden Hudson's affidavit contradicts the

regulations saying that excess property would be confiscated, and so it must be stricken.

Decker asserts that Dunbar used a "no restroom policy" to restrict daily access to the law library because of "physical pain and suffering." He points to a grievance response saying that inmates needing to use the restroom must sign out and return to their housing assignment; however, a grievance investigation worksheet quotes Dunbar as saying, on February 10, 2005, that inmates are given a restroom break an hour into the law library session. Decker states that Dunbar has a "barbaric scheme" that if an inmate signs out in the first hour for a restroom break, she would deny extra time by "relentless rule bending and drafting," and then if he would not sign out in the first hour, so as to qualify for extra time, she would enforce another "truculent rule," that if he could not hold his bladder, he could not return for extra time.

Decker argues that he could not hold his bladder for three hours, and that he suffered injury when he was not allowed to use the restroom on July 7, 2005. Decker states that a "rupture" is a breaking or tearing of body tissue, and indicates that he suffered a "bladder rupture" even without a complete break in the bladder wall. Decker contends that Dr. Stanley's affidavit must be struck because it is hearsay and because Dr. Stanley did not rely on scientific or valid methodology to reach his conclusions.

In 1999, Decker says, a number of inmates died from heat complications, and so officials obtained large fans for the dayrooms, and allowed inmates to have fans in their cells. However, these officials now contend that Decker's heat restrictions apply only to work assignments. He says that all the other prisoners were put in 10 Building, which is air conditioned, while he was placed in an outside cage despite being vulnerable to heat.

Decker next contends that he was scheduled for law library access with safekeeping inmates, which he says was a "long running deceptive scheme to completely disenfranchise Plaintiff completely [sic] from accessing law library and then have him physically assaulted, unless he waives the constitutional rights and stops filing grievances." He says that he was scheduled with the safekeeping inmates in order to "put a homosexual jacket on him" so that he would be physically assaulted; although he notified officials, he says that nothing was done.

Decker says that he has shown a chronology of retaliation in that after each grievance was filed, a "bogus contrived disciplinary case" was written. He says that a claim to file false disciplinary cases in retaliation for legal activities has an arguable basis in law, and that he suffered harm through the failure of prison officials to abide by established disciplinary procedures. Decker states that none of the actions with which he was charged were prohibited by any TDCJ rules, and of the 34 cases which he was written, over half did not go through. He states that those which did not go through were "written for malicious prosecution purposes," including a case no. 2006001122 which was written for "failure to stop talking." Decker says that it is "suspicious" that the Defendants say that there is no record of any cases in which he was vindicated. In case no. 20050055433, Decker says that he was charged with failure to obey an order, but the order was not a legitimate one, the regulation is vague and "inherently standardless," and he lacked notice that his conduct was forbidden. He complains about the contraband cases he received, including cases for the ziplock baggies, the rubber grip on the pen, the shoe string

tied around his headphones, an eyeglasses case, and commissary hot sauce, saying that none of these items jeopardized unit safety and all were items he had purchased in the commissary. He says that these disciplinary cases violated the Americans with Disabilities Act and are evidence of malicious prosecution. In addition, Decker says, it violates the First Amendment to receive disciplinary action for asking to use the restroom or requesting extra time in the law library.

Turning to his Americans with Disabilities Act claims, Decker says that he received a disciplinary case for improperly stored legal work. He says that the prison rules require inmates to store legal work on the right side of the bunk locker, which sits on the floor underneath the table. However, he says that he is "medically restricted from accessing his locker." Consequently, he had his legal work stored in an extra locker box. This, Decker says, is the primary reason he cannot qualify for another legal box, as "promised retaliatory cases were sure to follow." He again says that the denial of his locker box and the subsequent confiscation of his legal materials caused an adverse ruling in the Fifth Circuit and the Supreme Court, pointing to a letter he received from the Clerk of the Fifth Circuit saying that the Court lacks jurisdiction to direct prison officials to give inmates special consideration in preparing their legal documents beyond the rules of the institution, but that prison policies would be taken into consideration in requests for extensions of time.

Decker also reiterates that he has been given a choice between cancer treatment and property, which he says is a violation of the ADA. He says that he could not leave the unit for "life sustaining cancer treatment" two years ago without losing his property, and now the cancer has spread through his right leg.

With regard to immunity, Decker provides an extended discussion of the difference between individual-capacity and official-capacity actions. He says that he has met his burden at summary judgment by alleging that the prison officials retaliated against him for exercising his constitutional right to file a grievance in a verified complaint. He says that qualified immunity is a question for the jury when it turns on what version of the contested facts are accepted, and that summary judgment is not proper if the issue of intent is raised.

Furthermore, Decker says, there is no immunity for his failure to protect claim because he submitted grievances telling prison officials that his life was in danger. He says that the Defendants' "bald assertions and conclusory denials" are not sufficient to sustain a motion for summary judgment. Finally, Decker says, he has not waived his right to a jury trial under the Seventh Amendment.

### General Standards for Summary Judgment

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Securities and Exchange Commission v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993); *General Electric Capital Corp. v. Southeastern Health Care, Inc.*, 950 F.2d 944, 948 (5th Cir.1991); Rule 56(c), Fed. R.Civ.P.

To avoid summary judgment, the non-moving party must adduce admissible evidence which creates a fact issue concern-

ing existence of every essential component of that party's case; a mere scintilla of evidence in favor of a plaintiff's position will not defeat summary judgment. *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir.1999). Similarly, the Fifth Circuit has held that unsubstantiated assertions of actual dispute will not suffice. *Thomas v. Price,* 975 F.2d 231, 235 (5th Cir.1992), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmovant must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a fair-minded jury that it is entitled to a verdict in its favor. *ContiCommodity Services, Inc. v. Ragan,* 63 F.3d 438, 441 (5th Cir.1995).

Summary judgment should be granted when the moving party presents evidence which negates any essential element of the opposing party's claim, including a showing that an essential element of the opposing party's claim is without factual support. *First American Bank & Trust of Louisiana v. Texas Life Ins. Co.,* 10 F.3d 332, 334 (5th Cir.1994). The granting of summary judgment is proper if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Caldas & Sons v. Willingham,* 17 F.3d 123, 126 (5th Cir.1994). Once the movant makes this showing, the burden shifts to the non-movant to come forward with evidence sufficient to establish the existence of a genuine issue of material fact. *Caldas,* 17 F.3d at 126–27.

Although the Court must draw all inferences in favor of the party opposing the motion, an opposing party cannot establish a genuine issue of material fact by resting on the mere allegations of the pleadings. *Hulsey v. State of Texas,* 929 F.2d 168, 170 (5th Cir.1991). Similarly, a bald allegation of a factual dispute is insufficient, in itself, to create a genuine issue of material fact. *Recile,* 10 F.3d at 1097 n. 15. A nonmovant cannot manufacture a factual dispute by asking the Court to draw inferences contrary to the evidence. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In short, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists. *Hulsey,* 929 F.2d at 170, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

This burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or, as stated above, by only a "scintilla" of evidence. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). Factual controversies are resolved in favor of the nonmoving party, but only when there is an actual controversy; that is, when both parties have submitted evidence of contradictory facts. However, the court will not, in the absence of proof, assume that the nonmoving party could or would prove the necessary facts. The Supreme Court has stated that resolving actual disputes of material facts in favor of the nonmoving party "is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint ... [I]t will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990), *quoted in Little,* 37 F.3d at 1075.

*Application of the Standards*
*to the Present Case*

## I. The Incident of July 7, 2005

█ Much of Decker's complaint centers around July 7, 2005. On that date, he says that he was denied access to the restroom and that he was placed in a holding cage for about an hour and a half. The grievance which he filed about this incident, no. 2005197493, says that

> On this date 7/7/05 scheduled L/L [law library] session for 12:15 to 14:30, I requested to use restroom @14:20 per Ms. Dunbar's rule, that offenders must sign out and terminates session. Prepare to Count was called simultaneously, Ms. Long told me I would have to wait until she verified count (she already had count done). Ms. Sharp, Gibson, Washington were talking, Ms. Sharp stated I don't care if you urinate your pants and die. At 14:50 after urinating (almost 3 hours wait) in my pants did Gibson take me to restroom, to finish. I didn't bring this to his attention until exiting L/L (to reduce humiliation).

> Gibson then took [inmate] Gilbert and myself to 12 Building chain pen, made sure we were in pen closest to the wall, no circulation. From 14:50 until 16:15 I sat in soiled urine, no water, no restroom breaks, no way to cool off, temp 95 degrees.

Thus, Decker's grievance makes clear that while he may have felt the need to use the restroom for three hours, as he said in his pleadings, he expressed this need to the law library officers at 2:20 p.m. Count was called at the same time, and he was told that he would have to wait until count could be verified. At 2:50 p.m., some 30 minutes later, Gibson took him to the restroom, but it was too late by that time—Decker states that he had already urinated in his pants.

In *Jarrell v. Seal,* slip op. no. A–03–2737 (E.D.La., Feb. 10, 2004) (unpublished) (available on WESTLAW at 2004 WL 241712), *aff'd* 110 Fed.Appx. 455 (5th Cir. 2004) (not selected for publication in the Federal Reporter), the plaintiff Chuck Jarrell, a pre-trial detainee, contended that his rights were violated when he was not taken to the restroom during a court appearance, causing him to urinate on himself in public. The district court acknowledged a constitutional right to void oneself of bodily waste in reasonable privacy, but held that a constitutional claim would be stated only where the defendant acts with deliberate indifference. In that case, the evidence showed that of the three named defendants, the Sheriff was not present and was not involved in any way and a female deputy named Lee declined to take Jarrell to the restroom because it was more appropriate that a male officer named Seal do so. Jarrell contended that Seal had just returned from taking two other inmates to the restroom and said "no, I am not taking you to the restroom, I'm not going back up those stairs." The district court said that Seal's response may have been inappropriate or negligent, but did not show deliberate indifference, in that it did not show that Seal "acted with an awareness that his action posed a substantial risk of serious harm and that he subjectively intended that harm occur." The court added as follows:

> While the court acknowledges that what occurred in this case as unfortunate, that does not mean that defendants violated plaintiff's constitutional rights. It would be imprudent for this Court to hold that law enforcement officials violate a pre-trial detainee's constitutional rights simply because they fail to provide restroom access immediately upon request. [citation omitted] Rather, something more must be shown, namely that defendants acted with deliberate indif-

ference. 'If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party bears the burden of proof at trial, there ceases to be a genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law.' [citation omitted]

In affirming this decision, the Fifth Circuit stated that the district court had correctly determined that Jarrell failed to present any summary judgment evidence to show either deliberate indifference or that he suffered any physical injury which was not *de minimis*. *Jarrell*, 110 Fed.Appx. 455, 456.

In the present case, Decker states in his grievance that he told the prison officers that he needed to use the restroom at 2:20 p.m., and that count was called at the same time. As a result, he was told that he had to wait until after the count was completed. Verification of count is a reasonable basis upon which to delay taking Decker to the restroom; Decker has not shown that the failure to do so was the result of deliberate indifference rather than the requirement that count be verified. As in *Jarrell*, the facts set out by Decker are insufficient to show that the defendants acted with deliberate indifference to his safety in this regard.

Also as in *Jarrell*, Decker has not shown that the defendants' action caused him to suffer any physical injury which was not *de minimis*. Decker says that he suffered a "ruptured bladder," but as Dr. Stanley points out in his affidavit, a ruptured bladder is a major medical emergency, generally associated with blunt or penetrating abdominal trauma, potentially life-threatening and requiring surgical intervention. *See also* Dr. Raymond Rackey and Dr. Sandip Vasavada, "Bladder Trauma," June 15, 2006, available online at e-medicine (from WebMD) at http://www.emedicine.com/MED/topic2856.htm. Decker's medical records contain no indication that he has suffered a ruptured bladder at any time, before or after July 7, 2005.

Decker's medical records do show that he suffers from a condition called BPH, or benign prostate hyperplasia, commonly known as an enlarged prostate. The National Institute for Health states that prostate gland enlargement is common as a man ages, and that by age 60, more than half of all men have some symptoms of BPH.[2] The causes of BPH are not well known, but theories include a decrease in the production of testosterone or an accumulation of dihydrotestosterone. Symptoms can include difficulty in urination, frequency of urination, or blood in the urine. *See* http://kidney.niddk.nih.gov/kudiseases/pubs/prostateenlargement/# symptoms.

Dr. Stanley's affidavit indicates that the symptoms experienced by Decker would not have resulted from the incident of July 7, 2005. Rather, he appears to suffer from BPH, and he is receiving treatment for this condition. Decker has not shown that he suffered any injury as a direct result of the refusal to take him to the restroom immediately when he asked to go on that date.

As a general rule, when an inmate alleges a serious medical need either for treatment or to avoid certain conditions, the inmate's bare assertion of a serious medical condition is insufficient without medical evidence verifying that the condition exists. *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir.1995); *accord, Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir.1994) (prisoner's self-diagnosis alone will not support a med-

**2.** TDCJ records show that Decker is 53 years old.

ical conclusion). Decker's bare assertion that he suffered from a "ruptured bladder" is nothing more than a self-diagnosis, lacking support in the medical records, and contra-indicated by the fact that had he indeed suffered a ruptured bladder in July of 2005, he would have long since required surgical intervention. As in *Jarrell,* Decker's claim on this point is without merit.

■ Decker also asserts that he was placed in a holding cell on a day that the temperature reached 95 degrees and left there for about an hour and a half, from 2:50 until 4:15 p.m. He does not indicate, in his pleadings or his grievances, that this holding cell was outside or even in direct sunlight, although he does say that it was the cell closest to the wall and that the building was not air-conditioned.

Even assuming that the holding cell was extremely hot, however, Decker has nonetheless failed to show a constitutional violation. His grievance shows that he was in this cell for just under 90 minutes, from 2:50 until 4:15 p.m. This is not an excessive period of time, so as to cause this exposure to rise to the level of a constitutional violation. *See Woods v. Edwards,* 51 F.3d 577, 581 (5th Cir.1995) (allegation that cell was inadequately cooled and high temperature also contributed to plaintiff's sinus condition not sufficient to survive motion for summary judgment; the Fifth Circuit concluded that "while the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment"); *Montgomery v. Johnston,* 184 F.3d 816 (5th Cir.1999) (not selected for publication in the Federal Reporter) (inmate's claim that he was forced to walk across hot concrete barefooted and then made to sit in the sun, wearing only boxer shorts, for four hours did not set out a constitutional claim), *citing Wilson v.*

*Seiter,* 893 F.2d 861, 865 (6th Cir.1990) (stating that "we are unaware of any precedent holding that occasional exposure to 95 degree heat" constitutes cruel and unusual punishment), *vacated on other grounds by* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In addition, Decker has not shown that he suffered any injury more than *de minimis* discomfort as a result of his brief stay in the holding cell. His medical records show that he went to the clinic at 22:09, or 10:09 p.m., on July 7, saying that he felt dehydrated and lightheaded because he had to sit in the cage for a couple of hours before getting moved into housing. No problems were noted with ambulation, his vital signs were not abnormal, his respiration was even and unlabored, and he was counseled on laying down when lightheaded, and told to submit a nursing sick call for non-emergency medical needs. Decker was seen again on July 19 and then on August 2, and made no complaints relating to his brief stay in the holding cell. Decker has failed to show that his placement in this holding cell amounted to a constitutional violation, and so his claim on this point is without merit.

*II. Denial of Access to Court*

■ Decker also devotes a large part of his complaint to asserting that he is being denied access to court by restrictions relating to law library access. He disputes the Defendants' assertion that he was able to get to the law library 382 times in 440 days, saying that the correct number was 112. Decker also complains that he did not get adequate time in the law library when he was allowed to go.

As harm, Decker says that he had a number of lawsuits or appeals which were dismissed as a result of this denial of access. However, he offers no specific facts showing that the lack of access to the

law library caused the dismissal of any of these cases.

The Fifth Circuit has held that civil rights claimants must state specific facts, not conclusory allegations. *Brinkmann v. Johnston,* 793 F.2d 111, 113 (5th Cir.1986); *see also Baker v. Putnal,* 75 F.3d 190, 195 (5th Cir.1996) (Section 1983 actions against individual governmental officials require "claims of specific conduct and action giving rise to a constitutional violation," not merely conclusory assertions). The Fifth Circuit has held that a party cannot defeat summary judgment with "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). Decker's listing of the cases which he had pending, together with his bare assertion that these cases were dismissed because of his lack of access to the law library, is not sufficient to defeat the Defendants' motion for summary judgment.

■ The law on access to legal materials states that inmates have a right of access to legal materials, and prison officials cannot deny inmates access to court. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). However, actual injury must be shown to set out a violation of *Bounds.* *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2179–81, 135 L.Ed.2d 606 (1996) (actual harm must be shown to establish a violation of the right of access to court); *accord, Mann v. Smith,* 796 F.2d 79, 83 (5th Cir.1986).

The Supreme Court has held that *Bounds* does not "guarantee inmates the wherewithal to transform themselves into litigating engines." *Lewis,* 116 S.Ct. at 2182. In *Lewis,* as noted above, the Court reaffirmed the longstanding requirement that inmates claiming a violation of *Bounds* must show actual injury. *Lewis,* 116 S.Ct. at 2180. The Court provided the following examples of "actual injury" under *Bounds:*

> [The inmate] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered some arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis,* 116 S.Ct. at 2180.

The Court has reviewed some of Decker's other litigation, which is extensive. In *Decker v. Dunbar,* 200 S.W.3d 807 (Tex. App.-Texarkana 2006, rehearing overruled, review denied, rehearing of petition for review denied), Decker complained that he was denied access to the prison law library because of the restrictive restroom schedule, he had been the victim of retaliation, and he was being denied a legal locker box despite his disabilities. The district court dismissed his lawsuit, and the Court of Appeals affirmed this dismissal.

The Court of Appeals noted that Decker did not show how the restrictions had denied him access to court, and that "Decker's writings are evidence of many hours of regular and extensive access to the prison law library over an extended period." The Court added that Decker did not show any allegations of harm from the claimed retaliation, and that Decker did not exhaust his administrative remedies with regard to his claim for injunctive relief on the locker box. The Court of Appeals also modified the district court's dismissal to render it without prejudice.

Decker has not shown, nor does the Court of Appeals' decision indicate, that the dismissal of this lawsuit was in any way connected to the alleged lack of access

to the law library. The decision makes clear that the dismissal was not based on a technical deficiency of which Decker could not have known as a result of deficiencies in the law library or his access thereto.

In *Decker v. State*, slip op. no. 2–06–230–CR, 2006 WL 2310821 (Tex.App.-Fort Worth, August 10, 2006, rehearing overruled), Decker appealed from the district court's refusal to issue a writ of audita querela, by which he sought to challenge the legality of his conviction. However, under Texas law, the sole means of raising a post-conviction challenge to a conviction is through habeas corpus; a felony conviction cannot be attacked by a writ of audita querela.[3] *McBride v. State*, 114 S.W.3d 556, 557 (Tex.App.-Austin 2002, no pet.). This action was not dismissed because of deficiencies in the law library or Decker's access thereto, but because it lacked any arguable basis in law. Decker's filing of a motion seeking the issuance of a writ of audita querela—hardly a matter of common knowledge even among lawyers—would tend to indicate that he had spent considerable time in the law library researching means by which to challenge his conviction, not that he had been denied such access.

In *In re Kurby Decker*, slip op. no. 2–06–108–CV, 2006 WL 908684 (Tex.App.-Fort Worth, April 6, 2006, rehearing overruled), an original proceeding in the Court of Appeals, Decker sought mandamus against a state district judge in Montague County. This request was summarily denied by the Court of Appeals. Decker has not shown that the disposition of this case resulted from the alleged denial of access

to the law library about which he complains.

In *In re Decker*, 187 S.W.3d 838 (Tex. App.-Texarkana 2006, no pet.), Decker sued various prison officials complaining that they were refusing to allow him access to medical treatment. The Bowie County district clerk's office confirmed the filing of the petition, but told him that no further action would be taken except by order of the district court. Decker thereupon filed an application for the writ of mandamus in the Court of Appeals, asking that the trial court be ordered to direct the district clerk to issue process. The trial court then entered an order dismissing the lawsuit. In light of this dismissal, the Court of Appeals dismissed Decker's mandamus petition, seeking issuance of process, as moot. Decker has not shown that the disposition of this case resulted from the alleged denial of access to the law library about which he complains.

In *Decker v. Clements, et al.*, slip op. no. 06–04–118–CV, 2005 WL 2216486 (Tex. App.-Texarkana, Sept. 13, 2005, rehearing overruled, pet. ref'd), Decker sued a number of prison officials, complaining of confiscations of his legal materials and failure to accommodate his physical ailments or disabilities. The Defendants filed a motion to dismiss arguing that Decker's lawsuit should be dismissed because he failed to file a qualifying affidavit detailing his previous filings, to exhaust his administrative remedies, to file the proper affidavit and forms documenting such exhaustion, to file his lawsuit on time, and to attach a certified copy of his inmate trust account statement. The district court granted the motion and dismissed the lawsuit, although

---

**3.** The writ of audita querela is a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of de-

fense or discharge arising since its rendition and which could not be taken advantage of otherwise. It may also lie for matters arising before judgment where the defendant had no opportunity to raise such matters in defense.

without specifying the precise basis for dismissal.

On appeal, the Texarkana Court of Appeals affirmed the dismissal on the basis that Decker had failed to file an affidavit or unsworn declaration setting out the date that his grievances were filed and the date that the written decision was received, although he did file the requisite grievances. However, the Court of Appeals did modify the trial court's decision to provide that it would be without prejudice.

Decker does not allege that he was unaware and could not have known of the requirement that he file such an affidavit as a result of the alleged restrictions on access to the law library, nor that he could not have discovered this requirement during the 112 law library sessions which he says that he received. In addition, it should be noted that the dismissal of the lawsuit without prejudice left him free to re-file it and correct the deficiency. *See Martinez v. Lueva,* 174 Fed.Appx. 235 (5th Cir.2006) (not selected for publication in the Federal Reporter) (available on WESTLAW at 2006 WL 905923) (the plaintiff's claim of denial of access to court was rejected on the basis that he had failed to show harm, even though the defendants' actions caused a civil lawsuit he had filed to be dismissed; the Fifth Circuit explained that this dismissal was without prejudice and the plaintiff failed to show how he was actually injured by the dismissal or why he could not have refiled the lawsuit). Decker has not shown that the disposition of this lawsuit resulted from the alleged restrictions on access to the law library, nor that he suffered harm cognizable under *Bounds.*

In *Decker v. Dretke,* 100 Fed.Appx. 266 (5th Cir.2004) (not selected for publication in the Federal Reporter) (available on WESTLAW at 2004 WL 1240478), Decker appealed the denial of his federal habeas corpus petition challenging his conviction for solicitation of capital murder. Decker asserted that he received ineffective assistance of counsel in that his attorney did not obtain psychiatric or neuropsychological reports and did not pursue an insanity defense at trial, but the evidence showed that counsel obtained a report from a clinical psychologist indicating that Decker was not insane. Counsel questioned the psychologist, reviewed Decker's records, talked to his family, and attempted to confer with Decker concerning the offense; ultimately, counsel elected not to pursue the insanity defense, at least in part, because it would have required admission of the charged conduct, an admission which Decker had not made. Instead, counsel elected to put the State to its burden of proof in light of perceived gaps in the evidence. The Fifth Circuit affirmed the district court's conclusion that Decker failed to show that the state court's decision was contrary to or involved an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Decker has not shown that the result of this proceeding reflects any harm from the alleged denial of access to the law library. In addition, it should be noted that Decker's federal habeas corpus petition was filed in 1998 and the decision by the district court was rendered in 2002, a period of time prior to the incidents forming the basis of the present lawsuit. Decker has not shown that the affirmance of the decision by the Fifth Circuit, or the subsequent denial of certiorari by the Supreme Court, came about because of the alleged restrictions on access to the law library, or that he suffered cognizable harm with the meaning of *Lewis v. Casey* with regard to his appeal or petition for certiorari in this case.

In *In re Decker*, slip op. no. 6–04–134–CV, 2004 WL 2752652 (Tex.App.-Texarkana, Dec. 3, 2004) (unpublished), Decker sought mandamus against a state district judge, asking that the judge be ordered to file written findings of fact and conclusions of law in Decker's dismissed state court lawsuit. The Court of Appeals concluded that there was no hearing held or evidence received, and no trial, and thus the trial judge had no duty to file written findings of fact and conclusions of law. Decker's application for the writ of mandamus was denied. Decker has not shown that the denial of this mandamus petition was related to any alleged restrictions on his access to the law library.

While Decker has also filed a number of other lawsuits and civil actions in state and federal court, these other actions were filed and resolved prior to the occurrence of the incidents forming the basis of this lawsuit. Decker has simply not shown that he suffered any harm of the type contemplated by the Supreme Court in *Lewis* with regard to his claim that his access to the law library or to legal materials has been unconstitutionally restricted; his conclusory allegations of harm are not sufficient to overcome the Defendants' properly supported motion for summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d at 1075. Consequently, Decker's claim on this point is without merit.

### III. Retaliation

■ Decker argues throughout his pleadings that he has been the victim of retaliation. He says that he has experienced retaliation through the receipt of allegedly false disciplinary cases, the scheduling of law library sessions, the search of his cell by Morton, and the confiscation of his locker box. Decker says that there is a "chronology showing retaliation" in the fact that within a few days after he filed a grievance, he would receive a "bogus disciplinary case."

■ The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir.1997). This requirement places a heavy burden upon inmates, because mere conclusory allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995). The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. *Johnson*, 110 F.3d at 310, *citing Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir.1995). A prisoner who asserts a retaliation claim must assert specific facts; mere conclusory allegations are not enough. *Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir.1988). *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir.1988).

The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

*Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995). The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately

insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves." *Woods,* 60 F.3d at 1166; *accord, Orebaugh v. Caspari,* 910 F.2d 526, 528 (8th Cir.1990) (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform."). As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance. *Orebaugh,* 910 F.2d at 528.

In this case, Decker seeks to show a "chronology of events" by stating that within a few days after he would file a grievance, he received disciplinary action. However, as set out above, the summary judgment evidence in this case contains dozens upon dozens of grievances filed by Decker. *See supra,* pp. 321–23, 325–31. Under these circumstances, it is inevitable that whenever Decker received a disciplinary case, it would have been within a short time after he filed a grievance.

Decker cannot use the fact that he files large numbers of grievances to shield himself from disciplinary action simply by claiming that the disciplinary cases he receives are in retaliation for his grievances. This is the very act that the Fifth Circuit warned of, in saying that prisoners cannot "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves." *Woods,* 60 F.3d at 1166.

Although Decker seeks to prove retaliation by asserting that the disciplinary cases were "bogus," he offers no evidence to support this contention beyond his own bald assertion that it is so. The Fifth Circuit has stated that the existence of a legitimate prison disciplinary report, while not an absolute bar to a retaliation claim, is "probative and potent summary judgment evidence," *Woods,* 60 F.3d at 1166, and Decker has offered nothing to counter this evidence. His unsubstantiated and conclusory claims that the disciplinary cases are "bogus" are not sufficient to show that he has been the victim of retaliation simply because these cases were given to him after he filed grievances.

Nor has Decker shown that but for the grievances, he would not have received the disciplinary cases. He points to comments by prison officials which he says demonstrate a retaliatory intent, but even given these remarks, Decker has not shown that he would not have received the disciplinary cases absent the existence of the claimed retaliatory intent. Decker's conclusory allegations that the disciplinary cases were "bogus" are not sufficient and his claim on this point is without merit.

Decker also complains that the scheduling of his law library sessions, including the fact that he was scheduled to go to the law library with inmates in safekeeping, was retaliatory. The records show that at various times, Decker was scheduled to go to the law library from 9:45 a.m. to 12:00 p.m., from 12:15 p.m. to 2:30 p.m., and from 3:45 p.m. to 6:00 p.m. He offers nothing whatsoever to show that the assignment of times was based on retaliation for the grievances which he filed, nor that but for these grievances, he would have been assigned to other law library session times. Neither has Decker offered anything beyond bare and conclusory allegations that the law library scheduling times caused him to suffer any cognizable harm. In his grievances, he appears to contend that when he was scheduled from 9:45 a.m.

to 12:00 p.m., it caused him to miss lunch, and when he was scheduled for a session that ended at 6:00 p.m., he had to miss dinner. For example, in the Step Two appeal of grievance no. 2006077181, Decker says that he should be given a choice between law library sessions and certain activities, but that he has been scheduled during morning and afternoon pill window sessions, chow, and necessities. When his session concludes at 6:00 p.m., he says in the grievance, the pill window and the chow hall are closed, and so he has to argue with officials to get a peanut butter sandwich, while "all other inmates receive a hot, nutritious meal."

It is obvious that any scheduling of a law library session will conflict with some other activity that is going on. Decker has not shown that his law library sessions were scheduled so as to retaliate against him for filing grievances, or that but for the filing of these grievances, the scheduling of his law library sessions would have been done in a way which was more to his liking. Decker's claim on this point is without merit.

Decker contends that searches of his cell by Officer Morton, on September 14 and 16, 2006, were done in retaliation for his filing of grievances. One of these was the search in which Decker's headphones were confiscated and he received a disciplinary case for possession of contraband, because the headphones had a string tied around them (creating an area where items could be stored).

As the Defendants state, searches are commonplace within the prison. The fact that Decker's cell was searched, even twice within a week, is not proof of retaliatory intent. In *Brown v. Craven,* 106 Fed. Appx. 257 (5th Cir.2004) (not selected for publication in the Federal Reporter), the plaintiff Trenton Brown alleged that two officers searched his cell and took his property in retaliation for his threat to file a grievance if an officer turned off a television. After he filed a grievance concerning this cell search, Brown stated that officers retaliated against him by searching his cell again and seizing additional property. After he filed yet another grievance, Brown contended that prison officials retaliated against him by bringing disciplinary charges for possession of contraband.

The district court dismissed Brown's lawsuit as frivolous, and the Fifth Circuit affirmed. The Fifth Circuit stated that neither frivolous filings nor secondary litigation activity may comprise the basis of a retaliation claim, citing *Johnson v. Rodriguez,* 110 F.3d 299, 311 (5th Cir.1997); because Brown's threatened grievance about the TV would have been frivolous, it cannot form the basis of a retaliation claim.

With regard to the second cell search, the Fifth Circuit held that Brown had failed to establish causation, in that he did not show that but for the alleged retaliatory motive, the undocumented contraband in his cell would not have been seized. Finally, with regard to the disciplinary case, the Fifth Circuit held that Brown could not show that but for the retaliatory intent, he would not have been charged with and convicted of possession of contraband.

A similar situation exists here. In the first place, Decker has not shown that any of the grievances which he filed were non-frivolous, and so these grievances cannot form the basis of retaliation claims, as the Fifth Circuit explained. Furthermore, contraband was seized from his cell in the form of headphones which had been altered by the addition of a string tied around them, and Decker has not shown that but for the alleged retaliatory motive, the headphones would not have been

seized, nor that he would not have received a disciplinary case for possessing the altered item. Decker does not assert that Morton was even aware of the grievances which he, Decker, had been filing, nor offer anything to show that but for the alleged retaliatory motive, the actions complained of would not have occurred. Decker has not offered anything beyond conclusory assertions to counter the summary judgment evidence offered by the Defendants, and his claim on this point is without merit.

Finally, Decker asserts that he was the victim of retaliation in that his locker box was confiscated. The summary judgment evidence shows that the locker box was confiscated because Decker was storing contraband ziplock bags in legal envelopes in the box. Decker has not shown that but for the retaliatory motive, the confiscation would not have occurred; in other words, that had the Defendants not possessed a retaliatory motive, they would have overlooked his use of the box for storing contraband items. Decker has failed to show causation and so his retaliation claim on this point is without merit.

In addition, the Court notes that Decker's claim in this regard is frivolous on its face. Decker's grievances indicate that his extra locker box was confiscated on February 17, 2004. However, the original complaint in this lawsuit was signed on September 15, 2006, over two and a half years later. *See Burrell v. Newsome*, 883 F.2d 416, 420 (5th Cir.1989) (limitations period in Texas is two years).

The Fifth Circuit has held that the district court may raise the statute of limitations *sua sponte* in cases brought under Section 1915. *Stanley v. Foster*, 464 F.3d 565, 568 (5th Cir.2006). In this case, it is true that Decker paid the full filing fee and thus is not proceeding *in forma pauperis*. However, 28 U.S.C. § 1915A, the screening statute, applies regardless of whether or not the filing fee has been paid. *Ruiz v. United States*, 160 F.3d 273, 274 (5th Cir.1998). *See also Webb v. Calhoun*, 61 Fed.Appx. 120 (5th Cir.2003) (not selected for publication in the Federal Reporter) (affirming *sua sponte* dismissal of paid complaint as barred by limitations under 28 U.S.C. § 1915A, where it was "apparent from the face of the complaint" that limitations was a bar). As in *Webb*, it is obvious from the face of the pleadings that Decker's complaint concerning the confiscation of his locker box, in February of 2004, is barred by limitations. This claim lacks merit and may be dismissed.

To the extent that Decker sues concerning the loss of property as a result of Morton's cell search, this claim is also without merit. He says that $25.00 worth of commissary was missing after the search, although he did not know if Morton had taken it or if other inmates living in the area had done so.

The doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (overruled in part on grounds not relevant here) and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir.1991). Three predeprivation conditions must exist before the doctrine can be applied. These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized. Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation

process. *Charbonnet v. Lee,* 951 F.2d 638, 642 (5th Cir.1992), *citing Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Myers v. Klevenhagen,* 97 F.3d 91, 94–95 (5th Cir.1996).

*Hudson* holds that deprivations of property by prison·officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. *Hudson,* 468 U.S. at 533, 104 S.Ct. 3194. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov.Code Ann. art. 501.007 (Vernon Supp.1994); *see also Murphy v. Collins,* 26 F.3d 541, 543–44 (5th Cir.1994). Thus, the appropriate forum for a claim concerning the loss of commissary items lies in state court or in the administrative procedures of TDCJ rather than federal court. *Simmons v. Poppell,* 837 F.2d 1243 (5th Cir.1988).

### IV. *False Disciplinary Cases*

■ Decker also appears to challenge the validity of the disciplinary cases which he received, repeatedly referring to them as "bogus." A number of these cases have already been the subject of litigation in this Court. *See Decker v. Director, TDCJ,* civil action no. 5:04cv46 (E.D.Tex., dismissed March 30, 2005, certificate of appealability denied by Fifth Circuit February 17, 2006). In that case, which was brought as a habeas corpus action, Decker challenged disciplinary cases which he received for being out of place on an occasion when he got into the commissary line, for being out of place in the chow hall when he moved from one table to another, and for having four plastic ziplock bags. Decker also complained that Officer Clements

[who later changed her name to Dunbar] told the hearing officer to "lean on" Decker because he is a troublemaker, that a property storage rule is being arbitrarily imposed on him which resulted in the February 2004 confiscation of his extra storage box, that Dunbar is directing officers to file false disciplinary cases against inmates who file grievances against her, and that Dunbar falsified the answer to a Step Two grievance by reporting that none of Decker's legal materials have been confiscated.

The Court determined that Decker's challenges to the disciplinary cases properly sounded in habeas corpus and that these lacked merit because Decker failed to show the deprivation of a constitutionally protected liberty interests. The remaining claims, which sound in civil rights, were dismissed because Decker has three strikes under 28 U.S.C. § 1915(g) and did not pay the filing fee or show that he was in imminent danger of serious physical injury.[4]

As in the prior case, Decker's complaint about the disciplinary cases which he received must fail, whether brought in habeas corpus or civil rights, because he has not shown that he was deprived of a constitutionally protected liberty interest by reason of any of these cases. The Supreme Court has held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S.

---

4. The dismissal of the prior lawsuit was without prejudice to Decker's right to refile his claims upon payment of the filing fee, which

was done in this case; hence, the dismissal in the prior lawsuit does not set up a *res judicata* bar in the present case.

472, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995).

In *Sandin,* a Hawaii prison inmate received a disciplinary case for "high misconduct" and two others for "low moderate misconduct." He appeared before the disciplinary hearing panel, but was not permitted to call witnesses. He was convicted of the charges and sentenced to 30 days of disciplinary segregation on the high misconduct charge and four hours of disciplinary segregation for each of the other two charges, served concurrently with the 30 days of confinement. Conner brought suit, claiming a denial of procedural due process in connection with the disciplinary hearing.

The trial court granted summary judgment in favor of the defendants, but was reversed on appeal. The Ninth Circuit held that Conner had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether or not Conner received all of the process due under the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In analyzing the plaintiff's claim, the Supreme Court first examined the state of the law, beginning with *Wolff.* There, the issue involved good time credits which bestowed mandatory sentence reductions and a regulation which provided that these credits could be revoked only for "flagrant or serious misconduct." *Wolff,* 418 U.S. at 545–46 and nn. 5 & 6, 94 S.Ct. 2963. The Court held that the statutory provisions in question created a liberty interest in a shortened sentence, which was an interest of "real substance" requiring minimum procedures necessary to reach an "accommodation between institutional needs and objectives and the provisions of the Constitution." *Wolff,* 418 U.S. at 556–57, 94 S.Ct. 2963.

*Wolff* was followed by *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). There, Massachusetts inmates complained of transfers from a medium security facility to a maximum security prison which had substantially less favorable conditions. These transfers did not involve the loss of good time credits or any period of disciplinary confinement. *Meachum,* 427 U.S. at 222, 96 S.Ct. 2532.

In analyzing the claim, the Court first laid down the principle that the Due Process Clause does not protect every change in the conditions of confinement which has a substantial adverse effect upon a prisoner. *Meachum,* 427 U.S. at 224, 96 S.Ct. 2532. Further, the Court held that the Due Process Clause itself does not create a liberty interest in prisoners being free from intrastate prison transfers because transfer to a maximum security facility, even one with more burdensome conditions, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum,* 427 U.S. at 225, 96 S.Ct. 2532. The Court said that *Wolff* was distinguishable because the protected liberty interest in good time credit was created by state law, while in *Meachum,* no law stripped away the discretion of state officials to transfer inmates for any reason or none at all. *Meachum,* 427 U.S. at 228, 96 S.Ct. 2532.

The cases after *Meachum* seized upon this dictum to place ever greater emphasis upon the dichotomy between mandatory and discretionary state regulations. *See Sandin,* 115 S.Ct. at 2298. This approach came to fruition in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Court did not look to whether the State had created an interest of "real substance," as in *Wolff;* instead, the Court posed the question of whether the State had gone beyond issuing

mere procedural guidelines and had used language of an unmistakably mandatory character such that an incursion upon liberty would not occur absent specified substantive predicates. *Sandin,* 115 S.Ct. at 2298, *quoting Hewitt,* 459 U.S. at 471–72, 103 S.Ct. 864.

The use of this methodology meant that inmates no longer were required to show an interest of "real substance" or that they faced a "grievous loss" of liberty retained after incarceration. *Sandin,* 115 S.Ct. at 2298, *citing Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (focusing on "grievous loss"). Instead, the inquiry had shifted from the nature of the deprivation to the language of the regulation. *Sandin,* 115 S.Ct. at 2299; *see Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (liberty interest in interstate transfer revolved around language of regulation); *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (liberty interest in visitation privileges revolved around language of regulation).

These holdings were routinely followed by the circuit courts, including the Fifth Circuit. *See, e.g., Giovanni v. Lynn,* 48 F.3d 908 (5th Cir.1995) (analyzing the liberty interest presented in the context of the language of the regulations involved, citing *Olim* and *Thompson* ).

In *Sandin,* however, the Supreme Court announced that this analytical framework has "strayed from the real concerns undergirding the liberty protected by the Due Process Clause" and that "it is time to return" to the principles set out in *Wolff* and *Meachum. Sandin,* 115 S.Ct. at 2300. Rather than examining the language of the regulations, the Court stated that the operative interest involved was the nature of the deprivation. Hence, the Court specifically disapproved of the mandatory or dis-

cretionary language analysis set out in *Hewitt* and its progeny. *Sandin,* 115 S.Ct. at 2300 and n. 5.

Instead, the Court held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin,* 115 S.Ct. at 2301.

*Sandin* cited *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental hospital triggers Due Process Clause) and *Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (involuntary administration of psychotropic drugs implicates Due Process Clause), as examples of restraints which trigger the Clause of their own force, but stated that the incarceration in disciplinary segregation present in that case did not create the type of deprivation in which the State might have created a liberty interest. *Sandin,* 115 S.Ct. at 2297 n. 4, 2299–300. As a result, the Court held that neither the Hawaii prison regulation at issue nor the Due Process Clause itself afforded the inmate a protected liberty interest entitling him to the procedural protections of *Wolff. Sandin,* 115 S.Ct. at 2302. The Court concluded that the fact that Conner was not permitted to call witnesses at his disciplinary hearing was not sufficient to accord him relief because no protected liberty interest was at stake.

In this case, the punishments imposed upon Decker included such items as cell, commissary, and recreation restrictions, and verbal reprimands. Such punish-

ments do not impose atypical and significant hardships on an inmate in relation to the ordinary incidents of prison life. *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir.1996); *Malchi v. Thaler*, 211 F.3d 953, 959 (5th Cir.2000). Because these punishments do not implicate a constitutionally protected liberty interest, Decker's claims concerning them are without merit.

Decker does not indicate that he lost any good time as a result of any of the cases of which he complains, but even if he did, he has nonetheless failed to show the deprivation of a constitutionally protected liberty interest. Under certain conditions, the loss of good time could inflict a punishment imposing an atypical and significant hardship upon an inmate, because the loss of such time could result in the denial of a liberty interest in early release from prison. This condition exists where an inmate is eligible for release on mandatory supervision. *See Madison v. Parker*, 104 F.3d 765 (5th Cir.1997) (release on mandatory supervision is arguably a liberty interest in the State of Texas). However, Decker is serving a sentence for aggravated kidnapping and thus is not eligible for release on mandatory supervision. Tex.Code Crim. Pro. art. 42.18, sec. 8(c)(3) (Vernon 1988).

Thus, any loss of good time which Decker may have sustained in any of the disciplinary cases of which he complains would serve only to affect his possible release on parole, inasmuch as Texas law provides that the sole purpose of good time credits is to accelerate eligibility for release on parole or mandatory supervision. Tex. Gov.Code, § 498.003(a). The Fifth Circuit has expressly held that there is no constitutional right to release on parole in the State of Texas. *Creel v. Keene*, 928 F.2d 707, 708–09 (5th Cir.1991); *Allison v. Kyle*, 66 F.3d 71, 74 (5th Cir.1995). Under these circumstances, the loss of good time credits do not affect a constitutionally protect-

ed right, but only the "mere hope" of release on parole. This hope is not protected by due process. *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *accord, Gilbertson v. Texas Board of Pardons and Paroles*, 993 F.2d 74, 75 (5th Cir.1993).

Furthermore, the timing of Decker's release is too speculative to give rise to a constitutionally protected liberty interest. *Malchi*, 211 F.3d at 959. Decker has failed to show the deprivation of a constitutionally protected liberty interest with regard to his claims of false disciplinary cases, and so his claim for relief must fail.

Decker also appears to contend that the TDCJ disciplinary regulations are vague and overbroad. Assuming that these doctrines are applicable to cases involving prison disciplinary rules, Decker's claims are nonetheless without merit. The Supreme Court has held that in a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Ferguson v. Estelle*, 718 F.2d 730, 732–33 (5th Cir. 1983). If the law does not reach constitutionally protected conduct, then it satisfies the overbreadth test. *Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. 1186; *see also Ferguson*, 718 F.2d at 733. By contrast, an unconstitutionally vague law is one which does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186, *citing Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Fifth Circuit has ex-

plained that the void for vagueness doctrine requires that a *statute* define a criminal or quasi-criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Buckley v. Collins,* 904 F.2d 263, 266 (5th Cir.1990). The Middle District of Louisiana has summarized the law, in a case involving prison disciplinary regulations, by saying that the doctrine of vagueness protects individuals from laws lacking sufficient clarity of purpose or precision in drafting, while overbroad legislation is unconstitutional because it sweeps protected activity within its proscription. *Cassels v. Stalder,* 342 F.Supp.2d 555, 566 (M.D.La. 2004).

Decker does not identify the precise disciplinary rules which he challenges as vague or overbroad. Nor does he show how any such regulations are in fact vague or overbroad, in that he has not shown that any challenged disciplinary rule reaches a substantial amount of constitutionally protected conduct, nor that the rule is so vague that a person of reasonable intelligence could not understand what is prohibited. His claim on this point is without merit.

## V. Deliberate Indifference to Safety

■ Decker asserts that the Defendants were deliberately indifferent to his safety by scheduling him to go to the law library with inmates in safekeeping. He says that this caused other inmates to believe that he was homosexual and ultimately led to his being assaulted.

■ The Fifth Circuit has held that prison officials have a duty not to be deliberately indifferent to the safety of their inmates. *Johnston v. Lucas,* 786 F.2d 1254, 1260 (5th Cir.1986); *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir.1986).

A showing of mere negligent indifference is not enough for a constitutional claim. *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

In *Davidson,* the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. *Davidson,* 474 U.S. at 347–48, 106 S.Ct. 668.

The Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

[A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference....

But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our

cases be condemned as the infliction of punishment.

*Farmer v. Brennan,* 511 U.S. 825, 837–38, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *see Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir.1994).

The Fifth Circuit has held that prison officials have a duty to protect inmates from violence at the hands of other prisoners; however, not every injury suffered by a prisoner at the hands of another rises to the level of a constitutional violation. *Horton v. Cockrell,* 70 F.3d 397, 400 (5th Cir. 1995). The plaintiff prisoner must prove both that he is incarcerated under conditions "posing a substantial risk of serious harm" and that the prison official's state of mind is one of "deliberate indifference" to the inmate's health or safety. *Horton,* 70 F.3d at 401, *citing Farmer,* 114 S.Ct. at 1977.

There is no concise definition of what types of prison conditions pose a "substantial risk of serious harm" under the Eighth Amendment. Instead, the Fifth Circuit said, this component of the test must be examined conceptually, making sure to be responsive to "contemporary standards of decency." The Court must consider "whether society considers the risk ... to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Horton,* 70 F.3d at 401, *citing Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

In this case, Decker has not shown that the assault of May 16, 2006 was in any way related to the fact that several months earlier, he had been scheduled to go to the law library with inmates classified to safekeeping. He simply makes conclusory assertions that this is so, which assertions are not sufficient to overcome a motion for summary judgment. Under Decker's reasoning, once he is assigned to go to the law library with inmates in safekeeping, any future acts of violence which may be taken against him by other inmates may be ascribed to the Defendants' action in so assigning him; however, this is not the case. The mere fact that Decker was assaulted after having gone to the law library with inmates in safekeeping is not proof that the two events were related; the Fifth Circuit has observed that the mere fact that one incident precedes another is not proof of a causal connection; this is the logical fallacy of post hoc ergo propter hoc (after this, therefore on account of this). *See Tampa Times Co. v. National Labor Relations Board,* 193 F.2d 582 (5th Cir. 1952) (post hoc ergo propter hoc is not sound logic).

Furthermore, Decker has not shown that assigning him to a law library session along with inmates in safekeeping created an excessive risk of which the prison officials knew, and which they disregarded. Nor has he shown that being assaulted several months later is a foreseeable risk of being assigned to go to the law library with inmates in safekeeping. *See Johnson v. Dallas Independent School District,* 38 F.3d 198, 200 (5th Cir.1994) (if state actors knowingly place a person in danger, the Due Process Clause of the Constitution has been held to render them accountable for the *foreseeable* injuries that result from their conduct); *accord, Urbach v. U.S.,* 869 F.2d 829, 831 (5th Cir.1989). Decker's claim of deliberate indifference to his safety is without merit.

## VI. The Americans with Disabilities Act

Decker raises broad and conclusory claims concerning the Americans with Disabilities Act, including allegations that the confiscation of his legal locker box, and refusal to provide him with another one, violate the Act, and that the disciplinary

cases given to him and the restrictions placed on his law library usage violate the Act.

 The courts have held that plaintiffs may not bring actions under 42 U.S.C. § 1983, the Civil Rights Act, to vindicate rights created by Title II of the Americans with Disabilities Act or Section 504 of the Rehabilitation Act. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir.2002), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 962, 154 L.Ed.2d 772 (2003). Furthermore, the Fifth Circuit has held that there is no individual liability in lawsuits under the Rehabilitation Act, and that individual liability for claims of violations of the Act cannot be secured by casting the lawsuit under Section 1983 rather than under the Act. *Lollar v. Baker*, 196 F.3d 603, 608–09 (5th Cir.1999). Because the remedies, procedures, and rights under the Americans with Disabilities Act are the same as those under the Rehabilitation Act, there is likewise no individual liability for claims of violations under the ADA. *Washburn v. Texas*, slip op. no. A–07–CA–116 (W.D.Tex., January 16, 2008) (available on WESTLAW at 2008 WL 170033) (unpublished), *citing Kacher v. Houston Community College System*, 974 F.Supp. 615, 619 (S.D.Tex.1997); *see also Bostick v. Elders*, docket no. 2:02cv291 (N.D.Tex., Jan. 10, 2003) (available on WESTLAW at 2003 WL 1193028); *Berthelot v. Stadler*, docket no. Civ.A. 99–2009 (E.D.La., October 19, 2000) (available on WESTLAW at 2000 WL 1568224).

In this case, Decker seeks to vindicate rights under the ADA through the vehicle of a Section 1983 lawsuit, which the Fifth Circuit has said is improper, and he seeks to impose individual liability upon the named defendants for violations of the ADA, which also is improper. Consequently, Decker's ADA claims are without merit.

Even aside from these fatal defects, Decker could not prevail on his ADA claim. The pertinent portion of the Americans with Disabilities Act, 42 U.S.C. § 12132, reads as follows:

Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

The Act specifically provides that the remedies, procedures, and rights set forth in Section 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a, shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of Section 12132. *See* 42 U.S.C. § 12133.

To make out a *prima facie* case under the ADA, the Plaintiff must establish: (1) that he is a qualified individual with disabilities; (2) that he was discriminated against by a public entity; and (3) that the discrimination occurred because of his disability. *Judice v. Hospital Service District No. 1*, 919 F.Supp. 978, 981 (E.D.La. 1996); *see Blanks v. Southwestern Bell Communications*, 310 F.3d 398, 400 (5th Cir.2002).

In this case, even given the dubious assumption that Decker is "a qualified individual with a disability" because of his knee problem, Decker has failed to show that he was discriminated against *because of* this disability. *See, e.g., Davidson v. Texas Department of Criminal Justice*, 91 Fed.Appx. 963 (5th Cir.2004) (not selected for publication in the Federal Reporter) (affirming dismissal of ADA lawsuit where plaintiff failed to show that he was adversely treated because of his handicap); *Shaw v. Texas Department of Criminal Justice*, 46 Fed.Appx. 225 (5th Cir.2002)

(not selected for publication in the Federal Reporter) (inmate denied participation in program for handicapped prisoners because of a notation in his record labeling him a member of a militant organization failed to show an ADA violation because the adverse treatment was not due to his disability). Decker offers nothing beyond the barest of conclusions to show that he was denied a locker box, or that he received disciplinary cases, *because of* any disability which he may have had; much of his pleadings are devoted to arguing that these adverse events occurred, not because of his disability, but because of his litigiousness. His claim under the Americans with Disabilities Act is without merit and must be dismissed.

In a somewhat related claim, Decker contends that he has been "put to a choice" between legal work and medical care. His medical records indicate that he has told the physician that he does not want to go to the hospital in Galveston for treatment until his legal matters are resolved; Decker indicates that he fears that if he leaves the unit for medical care, his legal property will be confiscated. However, this fear appears to be an inchoate apprehension and wholly speculative. Warden Hudson's affidavit states that if Decker leaves the unit for medical care, his property will be taken and stored in the same manner as that of any other inmate leaving the unit for medical care. Decker offers no concrete basis upon which to believe that this is not the case; he cannot use speculative fears as a basis for a civil rights lawsuit. *See Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir.1981) ("mere remote or speculative possibility of injury" is not sufficient to maintain an action under Section 1983); *accord, Bailey v. Southerland,* 821 F.2d 277, 279 (5th Cir.1987).

*VII. Conspiracy and Discrimination*

■■■ Throughout his pleadings, Decker contends that the Defendants conspired against him. The Fifth Circuit has stated that specific facts must be pled when a conspiracy is alleged; mere conclusory allegations will not suffice. *Hale v. Harney,* 786 F.2d 688, 690 (5th Cir.1986). In pleading these specific facts, the Plaintiff must allege the operative facts of the alleged conspiracy. *Lynch v. Cannatella,* 810 F.2d 1363, 1369–70 (5th Cir.1987). In addition, to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. *Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir.1984).

In this case, Decker presents nothing more than conclusory allegations to support his claim of conspiracy, which are insufficient to sustain a Section 1983 action or to defeat a motion for summary judgment. Neither has he shown that any of the alleged conspiracies resulted in an actual deprivation of any constitutional rights. For this reason, Decker's conspiracy claims are without merit.

■■■ Decker also asserts a conspiracy claim under 42 U.S.C. § 1985. Such a claim requires a showing that the conspiracy was motivated by racial animus. *Word of Faith Outreach Center Church Inc. v. Sawyer,* 90 F.3d 118, 124 (5th Cir.1996). Decker argues that because Dunbar is black, she gave preferential treatment to black inmates in scheduling law library sessions. However, he has not shown that the law library schedules given to other persons affected his own constitutional rights. As discussed above, the evidence shows that Decker was afforded ample access to the law library, by his own statement attending some 112 times in a 440 day period. He has not shown that any alleged deprivation of access caused him to suffer harm in any non-frivolous legal activity; on the contrary, the evidence shows

that Decker has been a frequent and active litigator in state and federal court. The Fifth Circuit has held that the right of access to legal materials is simply an offshoot of the right of access to court, because the Court's main concern is protecting the ability of the inmate to prepare a petition or complaint. *Mann v. Smith,* 796 F.2d 79, 83 (5th Cir.1986), *citing Bounds,* 430 U.S. at 828 and n. 17, 97 S.Ct. 1491. In this case, Decker had constitutionally adequate access to legal materials, and so the fact that he believes that other persons may have been granted more access than he received does not show that his personal constitutional rights were violated; he does not have a right to unlimited access to legal materials or to all of the access which he personally believes is appropriate, but rather to sufficient access to protect his ability to prepare a petition or complaint. *Bounds v. Smith,* 430 U.S. at 824–25, 97 S.Ct. 1491; *cf. Sands v. Lewis,* 886 F.2d 1166, 1169–71 (9th Cir.1989) (no right to receive unlimited supply of pens and writing material, but only that which is sufficient to protect their right of access to court). Because Decker received constitutionally sufficient access to the law library for his own legal purposes, his complaint that other persons may have received more time in the law library than he did fails to show a constitutional deprivation. *See generally Coon v. Ledbetter,* 780 F.2d 1158, 1159 (5th Cir.1986) (persons claiming a deprivation of constitutional rights are required to show a deprivation of their personal rights). Decker's claim of an equal protection violation, and his related conspiracy claim under Section 1985, are without merit.

## VIII. *RICO and the Hobbs Act*

Decker asserts that the Defendants are acting in violation of RICO, the Racketeer Influenced and Corrupt Organizations Act. In order to maintain a civil cause of action under RICO, the plaintiff must show a pattern of racketeering activity connected to the acquisition, establishment, conduct, or control of an enterprise. *In re Burzynski,* 989 F.2d 733, 741 (5th Cir.1993). A pattern of racketeering activity requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continuing criminal activity. *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 441 (5th Cir.2000). Decker's vague and conclusory allegations are wholly insufficient to show a pattern of racketeering activity connected to the acquisition, establishment, conduct, or control of an enterprise, nor do his allegations give rise to any of the offenses listed as predicate acts in 18 U.S.C. § 1961(1) upon which a pattern of racketeering activity could be based.

Furthermore, the Fifth Circuit has held that a RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the RICO violation. *Brown v. Protective Life Insurance,* 353 F.3d 405, 406 (5th Cir.2003), *citing Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Decker has failed to make such a showing, in that he has not linked any alleged losses of property to a "pattern of racketeering activity" connected to the acquisition, establishment, conduct, or control of an enterprise. *See Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (RICO plaintiff must show that the alleged racketeering activity was both the "but for" and proximate cause of the injury to his business or property. In addition, Decker has not shown a "continuing enterprise," which is a necessary element of a RICO claim.) *Chapa v. Ingram,* 116 Fed. Appx. 476 (5th Cir.2004) (not selected for

publication in the Federal Reporter), *citing Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 425–26 (5th Cir.1987). Decker's claim under RICO is without merit.

Decker contends that TDCJ's storage space regulations violate the Hobbs Act, 18 U.S.C. § 1951. This statute says that an individual commits a federal crime if he obstructs, delays, or affects commerce by robbery, extortion, or committing or threatening physical violence to any person or property in furtherance of a plan to do anything in violation of this section. *See, e.g., Scheidler v. National Organization for Women, Inc.*, 547 U.S. 9, 13, 126 S.Ct. 1264, 1268, 164 L.Ed.2d 10 (2006). Decker has wholly failed to show that TDCJ's storage regulations amount to a violation of the Hobbs Act. In addition, the Hobbs Act is a criminal statute which does not create a private right of action. *WSB Electric Co. v. Rank & File Committee to Stop 2–Gate System*, 103 F.R.D. 417, 419 (N.D.Cal.1984); *Wisdom v. First Midwest Bank*, 167 F.3d 402, 408–09 (8th Cir.1999). Consequently, Decker cannot pursue a claim under the Hobbs Act as a private individual.

### Qualified Immunity

The Defendants pleaded the defense of qualified immunity in their motion for summary judgment. The Fifth Circuit has held that to prevail in a Section 1983 lawsuit, a plaintiff must overcome an officer's defense of qualified immunity. To determine whether relief is appropriate, the court must undertake a two-step analysis. First, the Court must evaluate whether a "plaintiff's allegations, if true, establish a constitutional violation." Second, if a constitutional violation is found to have occurred, the court must determine whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003), *citing Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

In *Hope*, the Supreme Court reiterated the standard for a constitutional right to be clearly established, as follows:

> Its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . . but it is to say that in the light of pre-existing law. the unlawfulness must be apparent."

*Hope*, 536 U.S. at 739, 122 S.Ct. at 2515, *citing Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The Supreme Court went on to clarify that the factual situation from which the pre-existing constitutional right developed does not have to be "fundamentally similar" to the one before a court when addressing qualified immunity. Rather, qualified immunity can be overcome as long as prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights. The Court concluded that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 740–41, 122 S.Ct. at 2515–16. The Court also indicated that summary judgment standards are properly used when reviewing invocations of the defense of qualified immunity. *Hope*, 536 U.S. at 734 and n. 1, 122 S.Ct. at 2512 and n. 1. This is consistent with established Fifth Circuit precedent. *Lampkin v. City of Nacogdoches*, 7 F.3d 430 (5th Cir.1993).

In this case, the Defendants have established their entitlement to qualified immunity in that Decker's allegations do not establish a constitutional violation and the competent summary judgment evidence shows that their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. For this reason, the Defendants are entitled to the defense of qualified immunity.

### Conclusion

The Court has carefully examined the record in this cause, including all of the Plaintiff's pleadings and documents, the Defendants' motion for summary judgment, the Plaintiff's response thereto, all of the summary judgment evidence submitted by the parties, and all other documents and records in the case. Upon such review, the Court has determined that there are no disputed issues of material fact and that the Defendants are entitled to judgment as a matter of law. The Court has further concluded that the Defendants are entitled to the defense of qualified immunity from suit. Consequently, this lawsuit should be dismissed.

### RECOMMENDATION

It is accordingly recommended that the Defendants' motion for summary judgment (docket no. 98) be granted and that the above-styled civil action be dismissed with prejudice.

A party's failure to file objections to the findings, conclusions, and recommendations contained in this Report within ten days after service with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appellate review of the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court.

*Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 22nd day of August, 2008.**